In re ANTHRACITE COAL ANTITRUST LITIGATION.

In re WILKES–BARRE STEAM HEAT COMPANY.

In re Steven J. HARTZ, Trustee in Bankruptcy for Neast & Co.

In re COLONIAL FUEL COMPANY.

M.D.L. No. 293, Civ. Nos. 76–1500, 77–699 and 77–1049.

United States District Court, M. D. Pennsylvania.

Sept. 29, 1978.

708

Victor Wright, Abraham C. Reich, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., Henry P. Perciballi, Williamsport, Pa., for plaintiff Wilkes-Barre Steam Heat Co.

Arnold Levin, Michael Fishbein, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., Lee C. Swartz, Harrisburg, Pa., for plaintiff Steven J. Hartz, Trustee in Bankruptcy for Neast & Co., Inc.

H. Laddie Montague, Jr., Merrill G. Davidoff, Daniel Berger, Berger & Montague, Philadelphia, Pa., William H. Bode, Alfred

Lawrence Toombs, Batzell, Nunn & Bode, Washington, D. C., for plaintiff Colonial Fuel Co.

James G. Watt, Allentown, Pa., for defendant Reading Anthracite Co.

Edwin P. Rome, Richard P. McElroy, Frederica Massiah-Jackson, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Kathleen M. Mills, Bethlehem, Pa., for defendants Greenwood Stripping Co., Pocono Fuels Co. and Lehigh Navigation-Dodson Co.

Edward F. Mannino, John F. Stoviak, Karen Marek McAlinn, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., Morey M. Myers, Gelb & Myers, Scranton, Pa., for defendants Reading Anthracite Coal Co., Pagnotti Enterprises, Inc., Pagnotti Coal Co., Lehigh Valley Anthracite, Inc., Jeddo-Highland Coal Co., and Lehigh Valley Coal Sales Co.

Leon H. Kline, Philadelphia, Pa., for defendants Glen Burn Colliery, Inc. and Farragut Anthracite Co.

## OPINION

MUIR, District Judge.

### I. Introduction.

These three related cases were assigned to the undersigned judge on August 22, 1977 and November 16, 1977 for the purpose of conducting pre-trial proceedings. On May 5, 1978, after two and one half days of hearings on the issue of class action certification, the three Plaintiffs in the above-captioned cases and the Defendants with the exception of Glen Burn Colliery, Inc. (Glen Burn) advised the Court that a settlement had been reached between the parties. Subsequently, the Court was advised that the matters had been settled with respect to Glen Burn as well. Following the mailing of notices to all customers of the Defendants who might be members of the classes represented by the three Plaintiffs, a hearing was held concerning the proposed settlements on September 25, 1978. The following represent the Court's findings of fact, discussion, and conclusion of law relating to whether the settlement agreements should be accepted by the Court.

### II. Findings of Fact.

1. Wilkes-Barre Steam Heat Company is the Plaintiff in the "industrial purchaser" class action, Civil No. 76–1500.

2. Stephen J. Hartz, Trustee in Bankruptcy for Neast & Co., and Colonial Fuel Company are the Plaintiffs in the two "dealer" class actions, Civil Nos. 77–699 and 77–1049, respectively.

3. The Defendants in the above actions are Blue Coal Corp., Glen Burn Colliery, Inc., Greenwood Stripping Corp., Jeddo-Highland Coal Co., Lehigh Navigation-Dodson Co., Lehigh Valley Anthracite, Inc., Lehigh Valley Coal Sales Co., Pagnotti Coal Co., Pagnotti Enterprises, Inc., Pocono Fuels Co., Reading Anthracite Coal Co., and Reading Anthracite Co.

4. On May 5, 1978, after two and one-half days of hearings on the trial of class action certification, the three Plaintiffs above named and the Defendants excluding Glen Burn Colliery (Glen Burn) advised the Court that a settlement had been reached between the parties.

5. On July 11, 1978, the Plaintiffs and Glen Burn reached a settlement.

6. Brokers are excluded from the dealer class.

7. A notice approved by the Court was mailed by first class mail to all customers of the Defendants who might be members of either the industrial user or dealer classes. In excess of 10,000 notices were mailed.

8. Names of potential class members were supplied by the Defendants and were taken by the Plaintiffs from the business records of Glen Burn and Blue Coal Corp. (Blue Coal).

9. By Order of June 12, 1978, the Court directed that elections to be excluded from either of the classes be filed on or before August 16, 1978, that notice of intention to appear and object to the proposed settlement together with supporting documents be mailed to the Clerk on or before August 25, 1978 with copies to counsel for the named parties and that a hearing concern-

ing the proposed settlements be scheduled for September 25, 1978 at 10:00 A.M.

10. No substantial numbers of members of the classes opted out of the proposed settlements and no three industrial users whose purchases of anthracite coal aggregated in dollar amount $15,000,000 opted out.

11. No person filed a notice of intention to appear and object to the proposed settlement on or before August 25, 1978.

12. The hearing was conducted as scheduled beginning at 10:00 A.M. on September 25, 1978 and at that hearing no person objected to the proposed settlements.

13. At the foregoing hearing all persons desiring to be heard evidenced support of the proposed settlements.

14. Extremely extensive discovery was had by the parties prior to entering into the proposed settlements including, but not limited to examination of grand jury documents from each Defendant, business records from the trustee of Blue Coal Corporation, a bankrupt, depositions, interrogatories, and the transcript of the trial in *United States v. Gillen*, Criminal No. 77–72 (M.D.Pa.)

15. Settlement of the actions except for those relating to Glen Burn provide for payment of $4,500,000 by the Defendants which is to be allocated $2,800,000 to the dealer class and $1,700,000 to the industrial user class, and the creation of "temporary settlement classes" for industrial users and dealers.

16. If Congress passes legislation prior to January 1, 1979 which effectively overrules *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), $800,000 of the settlement fund will be allocated to customers of members of the dealer class and any residue thereof after payments to such indirect purchasers will be returned to the settlement fund.

17. The settling Defendants had a further option that they could terminate the settlement agreement if 15% or more of the class members excluded themselves or three large purchasers who are class members and whose purchases totalled more than $15,000,000 excluded themselves.

18. In a separate settlement agreement Glen Burn agreed to pay $105,000 over and above the $4,500,000 by August 11, 1978.

19. Glen Burn had no option to terminate the settlement or to have the settlement fund reduced if *Illinois Brick* legislation is passed by Congress effective on or before January 1, 1979.

20. Some of the members of the industrial purchaser class are.
Ford Motor Company
GAF
Goodyear Tire and Rubber Company
Gulf Oil Corporation
Humble Oil Company
Monsanto Chemical Company
Nabisco
Union Carbide
Wyandotte Chemical Company

21. This litigation is extremely complex and expensive.

22. Although these cases are presently set for trial in Williamsport in January, 1979, it is likely that, if the cases were tried, by reason of appeals to the Court of Appeals and possibly to the United States Supreme Court, together with remand or remands, the termination of the cases could take years.

23. By order of September 30, 1977, all discovery in the above cases was directed to be completed by December 19, 1978.

24. Despite the fact that many witnesses have asserted their Fifth Amendment rights during depositional discovery in this case, there appears to be sufficient evidence to establish a conspiracy among the Defendants to fix prices of at least certain grades of anthracite coal.

25. In the event that Congress passes a statute which effectively overrules *Illinois Brick Co. v. Illinois*, 431 U.S. 770, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) and there has been no settlement with respect to the dealer class, recovery by dealers in this litigation would be very substantially reduced.

26. The judiciary committee of each House of Congress prior to the settlement agreement in these actions had reported out a bill which would have effectively overruled *Illinois Brick Co. v. Illinois*, 431 U.S. 770, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

27. As of September 25, 1978, the date of the hearing on the proposed settlement, neither House of Congress had enacted a bill so reported out.

28. The $800,000 of the settlement fund which is to be applied towards the satisfaction of the claims of indirect purchasers who are customers of the members of the temporary dealer class if Congress passes the above legislation effective on or before January 1, 1979 constitutes 17% of the settlements to the temporary settlement classes and 28.6% of the amount allocated to the temporary dealer class.

29. The difficulty of proof that prices to industrial users were based upon circular prices which allegedly were fixed by the Defendants creates a substantial risk for the temporary industrial user class.

30. Most of the anthracite coal purchased by industrial users was buckwheat Nos. 4 and 5 and filtercoal.

31. The circular prices fixed by the Defendants did not specifically include buckwheat Nos. 4 and 5 and filtercoal.

32. Some of the industrial users might have been precluded from recovering because of a defense based upon the contention that any increase of prices resulting from price fixing by the Defendants was passed on to their customers, contingent upon the passage of legislation overruling *Illinois Brick Co. v. Illinois, supra.*

33. The class members are spared substantial effort and expense in proving damages at trial by reason of the settlement.

34. There was substantial uncertainty at the time of the settlement as to whether this Court would certify the two classes, which uncertainty is buttressed by the declination of this Court to certify the State of New York and the Commonwealth of Pennsylvania as representatives of classes.

35. Although the Defendants may be able to withstand a judgment greater in amount than $4,605,000, the upper limit of what judgment the Defendants would be able to withstand is not known.

36. Many of the Plaintiffs depend upon the Defendants for energy supplies.

37. The amount of liability which may be assessed in the other cases presently pending in this Court and in cases to be filed against the Defendants in the future is uncertain.

38. The Defendants' total sales of anthracite coal from 1971 through 1974 was approximately $230,000,000.

39. Approximately $150,000,000 of the sales of anthracite for that period was to the members of the dealer and industrial settlement classes.

40. The settlement fund is approximately 3.08% of all estimated sales to the settlement classes.

41. At most, 11% of the sales to the dealer and industrial settlement classes reflects the result of alleged price fixing by the Defendants.

42. Because of the statute of limitations, it is possible that the Plaintiffs would be entitled to recover damages only for the period November, 1972 through November, 1974, the latter date being the date the Plaintiffs allege that the price fixing terminated and the 1972 date being four years prior to the indictment in *United States v. Blue Coal Corporation,* Criminal No. 76–149 (M.D.Pa.).

### III. Discussion.

The issue before the Court is whether the settlement of these three proposed class actions should be approved. Such a consideration is necessary in a case of this type because F.R.Civ.P. 23(e) states that a class action shall not be dismissed or compromised without the approval of the Court. Before the Court approves such dismissal or compromise, it must make a determination of whether the proposed settlement agreement is fair and reasonable so that the interests of all the members of the

classes are protected. The decision of whether to approve the proposed settlement of the class action is left to the sound discretion of the trial court. *See Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975).

■ The standards for a judicial approval of a proposed class settlement are cogently set forth in Judge Luongo's opinion in *Kusner v. First Pennsylvania Corp.,* 74 F.R.D. 606, 608 (E.D.Pa.1977), *quoting City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir. 1974). The most important factor to be considered is whether the strength of the case for the Plaintiffs on the merits is adequately reflected in the amount offered in settlement. Other factors to be considered include: (1) the complexity, expense, and likely duration of the litigation, (2) whether members of the classes have opted out of or objected to the settlement, (3) the stage of proceedings at which the case was settled and the amount of discovery completed at that time, (4) the risks borne by the Plaintiffs of establishing liability and damages, (5) the risks of maintaining the class action throughout the trial, (6) the ability of the Defendants to withstand a greater judgment, (7) and whether the settlement fund is reasonable when considered in light of the best possible recovery and in the light of all the attendant risks of litigation. *See also Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975). A proper consideration of those factors discharges the Court's fiduciary responsibility as the guardian of the rights of the absentee class members. However, the policy of the law generally to encourage settlement and a fair consideration of the efforts of experienced counsel which produced the settlement should be kept in mind by the Court as factors favoring approval of the settlement. *See Florida Trailer & Equipment v. Deal,* 284 F.2d 567 (5th Cir. 1960); *Seiffer v. Topsy's International, Inc.,* 70 F.R.D. 622 (D.Kan.1976). The Court will consider each of the above-enunciated factors in determining whether the proposed settlement in this case is fair and reasonable.

■ First, the Court must consider the complexity, expense, and likely duration of the litigation. The three cases involved in this settlement are all proposed class actions and are related to a number of other actions, both class and individual ones, stemming out of an alleged conspiracy between a number of Defendant coal-producing companies to fix the prices of anthracite coal between 1961 and 1977. The issues were complex and the litigation appears to be exceedingly expensive based upon this Court's knowledge of the amount of discovery which has been conducted to date in other related cases, the amount of discovery which was conducted in these cases prior to settlement, and the necessity for various pre-trial proceedings such as class action hearings. Although two of the above-captioned cases were scheduled to be tried in January, 1979 in Williamsport, Pennsylvania, had the cases gone to trial it is likely that one or both sides would have appealed. The appeals process, which may include consideration of the cases by the United States Court of Appeals for the Third Circuit, the United States Supreme Court, and this court upon remand, could take years. If the Court approves these settlements, the money will be disbursed to the class members in early 1979. Therefore, the settlements do promote speedy resolution of the action and were undertaken at a point in the litigation where both sides were in possession of sufficient information to reach a fair settlement agreement based upon an evaluation of the expense involved and the complexity of the issues raised.

The second factor to be considered is whether a substantial number of members of the class either opted out of the settlement or objected to it. An extremely small number of the members of the dealer and industrial user class have opted out of the settlement and none of the largest members of those cases have decided to do so. Further, although over 10,000 notices of the date of the hearing were mailed out, no class member appeared at the hearing for the purpose of objecting to the settlement. Counsel related to the Court at that time that in their experience in litigating antitrust class actions, it is extremely unusual

not to encounter objections to proposed settlements. Therefore, the reaction of the class to the settlement favors its approval.

The Court must next consider the stage of the proceedings and the amount of discovery completed. As indicated above, both parties were aware of the basic facts of the litigation and the cases have been pending between one year and two years. Counsel for the Plaintiffs were involved in the investigation of the facts of the case for some time prior to the filing of the complaints and a large number of documents have been turned over to the Plaintiffs by the Defendants. Therefore, the parties were in a position to evaluate the risks inherent in these cases.

The Court must next consider what risks the Plaintiffs ran in conducting the case. It is the view of the Court that the Plaintiffs would not run a substantial risk in attempting to establish that the Defendants committed certain actions in violation of the antitrust laws, particularly with respect to the allegation concerning a conspiracy among the Defendants to fix the circular prices of anthracite coal. However, each particular class ran some risk with respect to the amount of damages which it could recover or whether it could recover any damages at all. With respect to the dealer class, there is currently pending in both Houses of Congress legislation which would effectively overrule the decision of the United States Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 770, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). If that legislation were passed, parties in the position of the Defendants in this case would be able to assert in an antitrust action that the Plaintiffs were not injured by the Defendants' conspiracy to fix the prices of anthracite coal because the Plaintiffs, as coal dealers, were able to pass those price increases on to their customers. A cause of action for such price fixing would also be vested in the customers of the members of the dealer class who were unable to pass the increased costs on to other persons and bore the antitrust injury themselves. In cases prior to *Illinois Brick* in which pass-on defenses were asserted against the dealer classes, the

amount recovered by the dealer class was substantially less than the total amount which the Defendants were found to have increased artificially the price of the products sold. Therefore, the settlement is a compromise of the risks involved both to the settling Defendants and the dealer class with respect to the proposed *Illinois Brick* legislation. The settlement also provides that $800,000 of the settlement fund will be placed in escrow to satisfy the claims of the indirect purchasers or customers of the members of the dealer class in the event that *Illinois Brick* legislation becomes effective on or before January 1, 1979. That amount of reduction, however, represents a lesser percentage reduction of the recovery by the dealer class than would occur if such legislation were passed before the termination of these actions. *See, e. g., In re Gypsum Cases*, 386 F.Supp. 959, 965 (N.D. Cal.1974).

The industrial class also ran some risk with respect to the *Illinois Brick* legislation. However, that class faced another contingency with respect to proving that it was damaged by a price fixing conspiracy by the Defendants. The conspiracy alleged is the fixing of circular prices of anthracite coal. The industrial users generally purchased buckwheat Nos. 4 and 5 and filtercoal none of which are included on the Defendants' circulars. The industrial classes' theory of the case was that prices set in independent contracts were related to circular prices so that they were in fact affected by the conspiracy to set circular prices.

With respect to both proposed classes, proof of damages, assuming that antitrust liability is established, is extremely difficult at a trial and the cost and expenditure of time involved in such proof is obviated by the allocation of damages in a settlement agreement. Finally, both classes involved in these actions faced a substantial risk that following class action hearings the court would decline to certify the cases as class actions. At the time of the major settlement, the parties did not have the benefit of this Court's ruling with respect to the New York and Pennsylvania governmental

classes. However, subsequent to hearings on those two cases, the Court declined to certify the classes. These two class actions have certain features in common with the Commonwealth of Pennsylvania case including the issue of fraudulent concealment and whether individual actions would be superior to class actions as vehicles for vindicating the rights of potential plaintiffs. Therefore, taking into account all the risks faced by both Plaintiffs and Defendants in this case, it is the view of the Court that the settlement agreement fairly reflects the contingencies involved.

The Court should also consider the ability of the Defendants to withstand a greater judgment. The Plaintiffs do not contend that the Defendant companies would not be able to pay a sum substantially in excess of the $4,605,000 provided for in the settlement agreement. However, both the industrial users and coal dealers depend in large part upon the Defendant companies for their supplies of anthracite coal either for their own use or for resale to others. It would not be in the best interests of the members of these classes to bankrupt their suppliers. Further, there are other actions pending in this Court based on similar claims against those Defendants which may subject them to substantial liability to other parties. Should Congress pass legislation effectively overruling *Illinois Brick Co. v. Illinois*, 431 U.S. 770, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), indirect purchasers of anthracite coal who are currently barred from maintaining suit would be permitted to assert claims against the Defendants. The number of such indirect purchaser suits could be extremely numerous and would subject the Defendants to an additional risk of liability. Therefore, the Court concludes that the amount of the settlement is adequate considering the relationship of the parties and the financial situation of the Defendants.

The Court must consider whether the amount of the settlement fund is reasonable considering the best possible recovery that could be had by the Plaintiffs and the attendant risks of this litigation. In connection with this item, the Court has found that between 1971 and 1974, sales of anthracite coal to members of the dealer and industrial classes amounted to approximately $150,000,000. The Plaintiffs' calculations indicate that at most, 11% of the sales between 1971 and 1973 reflect the result of price fixing by the Defendants. The recovery provided for is slightly in excess of 3% of all estimated sales or approximately 28% of the maximum possible recovery excluding the trebling of damages. However, although the Plaintiffs allege that the conspiracy to fix prices began as early as 1961, the statute of limitations in an antitrust action is four years. The statute is tolled by the filing of a criminal indictment based upon the same allegations and such an indictment was filed in the case of *United States v. Blue Coal Corporation*, Criminal No. 76–149 (M.D.Pa.). Nevertheless, if the Plaintiffs could not prove fraudulent concealment of the conspiracy, they would be limited to the recovery of damages from November of 1972 through November of 1974, the time at which they allege the conspiracy ended. The Plaintiffs indicate that because of the oil embargo and the bankruptcy of Blue Coal, damages for the year 1974 would be extremely difficult to prove. Therefore, the best possible recovery might be substantially less than 11% of the sales between 1971 and 1973. Additionally, the Court has identified substantial risks which the Plaintiffs would run in terms of class certification and establishing liability and damages. Consequently, the Court concludes that the settlement is reasonable taking into account both the best possible recovery and the attendant risks of this litigation.

For the foregoing reasons, it is the view of this Court that the settlement agreements reached between Colonial Fuel Company, Steven J. Hartz, Trustee in Bankruptcy for Neast & Co., and Wilkes-Barre Steam Heat Company and the Defendants in the above-captioned cases involving payment of $4,605,000 are a fair and reasonable compromise of the antitrust claims asserted by those Plaintiffs and that the terms of the settlement agreements protect the in-

terests of the members of the class who have not appeared before the Court.

### IV. Conclusion of Law.

The proposed $4,605,000 settlement entered into between Plaintiffs and Defendants in the three above-captioned actions is fair and reasonable.