**In re LINERBOARD ANTITRUST LITIGATION**

**This document Relates to All Actions.**

**MDL No.1261.
Civ.A. No. 98–5055, 99–1341.**

United States District Court,
E.D. Pennsylvania.

April 21, 2004.

See, also, 2003 WL 23525699.

Howard I. Langer, Golomb Honik & Langer, Philadelphia, PA, for Box plaintiffs and Liaison counsel for all plaintiffs.

Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman & Kodroff, Philadelphia, PA, Michael J. Freed, Steven A. Kanner, William London, Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, IL, for General Refractories Co. and Co-Lead counsel for Corrugated Sheet plaintiffs.

Robert J. LaRocca, Kohn, Swift & Graf, P.C., Philadelphia, PA, H. Laddie Montague, Martin I. Twersky, Berger & Montague, P.C., Philadelphia, PA, Roberta D. Liebenberg, Donald L. Perelman, Fine Kaplan & Black, Philadelphia, PA, W. Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Box plaintiffs, Oak Valley Farms, Inc., Garrett Paper Inc., Local Baking Products, Inc.

Mark Reinhardt, Mark Wendorf, Reinhardt & Anderson, St. Paul, MN, for Alber I Halper Corrugated Box Co.

James J. Rodgers, Dilworth Paxson, LLP, Philadelphia, PA, Richard J. Lever-

idge, Elaine Metlin, Sarbina Nelson, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for Tag-a-long plaintiffs.

Sherry Swirsky, Schnaeder, Harrison, Segal & Lewis, LLP, Philadelphia, PA, for defendants.

Douglas J. Kurdenbach, Kirkland & Ellis, Chicago, IL, for Tenneco, Inc., Tenneco Packaging and Packaging Corp. of America.

Steven J. Harper, Steven C. Seeger, Kirkland & Ellis, Chicago, IL, Daniel B. Huyett, Matthew W. Rappleye, Stevens & Lee, Reading, PA, for International Paper Co., Union Camp Corp.

James H. Schink, Kirkland & Ellis, Chicago, IL, for Weyerhaeuser Corp.

R. Mark McCareins, Dane A. Drobny, Michael J. Mayer, Andrew D. Shapiro, Winston & Strawn, Chicago, IL, for Jefferson-Smurfit Corp., Stone Container Corp., Smurfit-Stone Container Corp.

Edward M. Posner, Paul H. Saint-Antoine, Drinker, Biddle & Reath, Thomas F. Slater, Jr., Hunton & Williams, Richmond, VA, for Georgia-Pacific Corp.

## MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

Presently before the Court is Class Plaintiffs' Motion for Final Approval of the Settlements with Defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. and with Defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation (docket no. 328, filed March 22, 2004) ("Motion for

Final Approval"). A hearing on the Motion for Final Approval was held on March 26, 2004 ("Fairness Hearing"). For the reasons that follow, the Court grants the Motion and approves the settlement agreements between the classes as certified by the Court and defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. ("the PCA Settlement") and between the classes as certified by the Court and defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation ("the Stone Settlement").

## II. BACKGROUND

### A. FACTUAL AND PROCEDURAL BACKGROUND

The Court sets forth only an abbreviated factual and procedural history as pertinent to the Motion for Final Approval. The factual background of the case is described at length in this Court's Memorandum dated October 4, 2000 denying defendants' Motion to Dismiss, its Memorandum dated September 4, 2001 certifying classes of direct purchasers of corrugated boxes and corrugated sheets, and the Opinion of the Court of Appeals for the Third Circuit affirming the September 4, 2001 Memorandum and Order. See In re Linerboard Antitrust Litig., MDL No. 1261, 2000 WL 1475559, at *1–3 (E.D.Pa. Oct.4, 2000) ("Linerboard I"); In re Linerboard Antitrust Litig., 203 F.R.D. 197, 201–04 (E.D.Pa.2001) ("Linerboard II"); In re Linerboard Antitrust Litig., 305 F.3d 145, 147–49 (3d Cir.2002) ("Linerboard III").

This is an antitrust action involving allegations that a number of U.S. manufacturers of linerboard[1] engaged in a continuing

---

1. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium,

combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The seven lawsuits transferred to this Court for all pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 12, 1999 were instituted after an administrative complaint filed by the Federal Trade Commission ("FTC") against Stone Container Corporation was resolved by a consent decree. *Linerboard I*, 2000 WL 1475559, at *1 (setting forth allegations in FTC complaint and details of consent decree). Class Plaintiffs named twelve defendants in their Complaints–Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit–Stone Container Corp., International Paper Company, Georgia–Pacific Corporation, Temple–Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of America and Weyerhaeuser Paper Company–and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories in violation of federal antitrust laws.

By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes:

### Class 1—Sheet Class

All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

### Class 2—Box Class

All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

*Linerboard II*, 203 F.R.D. at 224. On September 25, 2001, defendants filed a Petition for Leave to Appeal pursuant to Federal Rule of Civil Procedure 23(f)[2] in the Court of Appeals. By Order dated December 18, 2001, the Court of Appeals granted that petition. Thereafter, on September 5, 2002, the Court of Appeals affirmed the ruling of this Court. By Order dated October 16, 2002, the Court of Appeals denied defendants' petition for *en banc* review. On January 14, 2003, defen-

---

between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

**2.** Appellate review of an order of a district court granting or denying class action certifi-

cation requires the permission of the Court of Appeals. Federal Rule of Civil Procedure 23(f) provides, in relevant part, as follows: "A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order."

dants filed a Petition for Writ of Certiorari to the United States Supreme Court. The petition was denied on April 21, 2003. *See Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003) (No. 02–1070).

In an Order dated August 26, 2003, this Court approved a partial settlement in the amount of $8 million between Plaintiff Classes and Temple–Inland, Inc. and Gaylord Container Corp. The $8 million settlement was reduced to $7.2 million in accordance with the terms of the settlement agreement based on the number of parties that subsequently opted-out of the classes. This first partial settlement was described by Plaintiff Classes as an "ice-breaker" settlement-a settlement that would lead to further settlements. Within a month of Court approval of the ice-breaker settlement, on September 22, 2003, the Plaintiff Classes and defendants International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company announced they had reached a settlement agreement in the amount of $68 million. The Court granted final approval of that settlement on December 8, 2003. Prior to that date, in October and November 2003, the parties announced the two additional partial settlements that are the subject of the pending motion-the PCA Settlement in the amount of $43 million and the Stone Settlement in the amount of $92.5 million. As a result of a "most favored nation's clause" in the PCA Settlement Agreement, the terms of the Stone Settlement triggered a reduction in the amount owed by PCA from $43 million to $34 million.[3] With the Court's approval of these last two partial settlements, all claims in the class action will be resolved for a total of $202.5 million. In absolute terms, according to a recent survey of all class actions between

1972 and 2003, the total settlements in the Linerboard litigation make it the sixth largest reported antitrust settlement. 24 Class Action Rep. 157, 169–170 (2003).

## B. THE SETTLEMENT AGREEMENTS BETWEEN CLASS PLAINTIFFS AND DEFENDANTS PACKAGING CORPORATION OF AMERICA, INC., TENNECO, INC., AND TENNECO PACKAGING, INC. AND WITH DEFENDANTS STONE CONTAINER CORPORATION, JEFFERSON SMURFIT CORPORATION AND SMURFIT STONE CONTAINER CORPORATION.

Settlement negotiations between the Plaintiff Classes and Defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. ("PCA Defendants") and settlement negotiations between the Plaintiff Classes and Defendants Stone Container Corporation, Jefferson Smurfit Corporation and Smurfit Stone Container Corporation ("the Stone Defendants") (collectively "Settling Defendants") began shortly after the settlements with Weyerhauser, International Paper, Union Camp and Georgia Pacific were announced. While the negotiations were conducted separately, Class Counsel "adopted a strategy directed towards settling the entire case and viewed both negotiations as part of a single route to a common goal." Declarations in Support of Class Settlements with the Stone and PCA Defendants and in Support of Class Counsels' Petition for Attorneys' Fees and Costs, Declaration of Howard Langer at 58 (docket no. 302, filed February 2, 2004). On October 28, 2003 an agreement was reached between the Plaintiff Classes and the PCA Defendants. On October 29,

---

**3.** See *infra* Section II.B.6

2003 an agreement was reached between the Plaintiff Classes and the Stone Defendants.

Reflecting the fact that both settlements were pursued with the common goal of settling the entire case, Class Counsel and the Settling Defendants submitted both settlements for preliminary and final approval in a single motion. Further, the Court considered both settlements at the Fairness Hearing held on March 26, 2004. Accordingly, this Memorandum will address both settlements.

The terms of the PCA and Stone Settlements are substantially similar but not identical.[4] The principal terms of both settlement agreements are as follows.

### 1. Approval of the Agreement and Dismissal of Claims

The settlement agreements commit the parties to seek Court approval of their respective agreements. PCA Settlement Agreement ¶ 14; Stone Settlement Agreement ¶ 14. The settlement agreements also provide that the parties shall jointly seek entry of a Final Order and Judgment approving the settlement agreements and that the form of order shall include a provision dismissing the action as to the Settling Defendants with prejudice. PCA Settlement Agreement ¶ 16; Stone Settlement Agreement ¶ 15.

### 2. Releases and Discharge

Upon final approval of the settlements by the Court, both agreements provide for a release of all claims against Settling Defendants arising out of the causes of action asserted in the case. PCA Settlement Agreement ¶ 18; Stone Settlement Agreement ¶ 17. The claims of the Plaintiff Classes against all of the remaining defendants are specifically excluded from the release. PCA Settlement Agreement ¶ 19; Stone Settlement Agreement ¶ 18.

### 3. Settlement Payment

The PCA Defendants agreed to pay the Plaintiff Classes $43 million, which was deposited into an escrow account. PCA Settlement Agreement ¶ 20. That amount was subsequently reduced to $34 million due to the triggering of "most favored nations clause" of the PCA Settlement Agreement.[5]

The Stone Defendants agreed to pay the Plaintiff Classes $92.5 million. Stone Settlement Agreement ¶ 19. The Stone Settlement Agreement provided that half of this amount would be deposited in an escrow account within 30 days of execution of the agreement. Id. ¶ 20(a). The other half will be deposited in the escrow account by January 15, 2005, together with accrued interest up to the date of the wire transfer to be calculated at the rate of 1.84 percent per annum. Id. ¶ 20(b). Class Counsel has informed the Court that the second installment is secured by irrevocable letters of credit issued by Deutsche Bank and J.P. Morgan/Chase. Class Pl.'s Mem. in Supp. of their Mot. For Entry of a Final Order Approving Settlement Agreement with Defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. and with Defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit

---

**4.** The PCA Settlement Agreement was filed with the Court as Appendix A and the Stone Settlement Agreement was filed with the Court as Appendix B to Class Pl.'s Mot. for Prelim. Approval of the Settlement with Packaging Corp. of America, Tenneco, Inc., Tenneco Packaging Inc., and the Settlement with Stone Container Corp., Jefferson Smurfit Corp. and Smurfit–Stone Container Corp. and for Authorization to Disseminate Notice (docket no. 297, filed December 30, 2003).

**5.** See *infra* section II.B.6.

Stone Container Corporation at 5 (docket no. 309, filed February 29, 2004) ("Class Plaintiffs' Memorandum").

#### 4. *Distributions from the Escrow Account*

Both settlement agreements provide that distributions from the escrow account shall be made pursuant to a Court approved Plan of Allocation. PCA Settlement Agreement ¶ 31; Stone Settlement Agreement ¶ 30. That plan was submitted to the Court at the March 26, 2004 Fairness Hearing.[6] The Court approved the plan by Order dated March 26, 2004.

6. At the March 26, 2004 Fairness Hearing, Plaintiff Classes submitted a proposed Plan of Allocation for Court approval. The Plan of Allocation provides for the appointment of a Settlement Administrator to oversee the pro rata distribution of all settlement funds. The following is a summary of the proposed plan:

1. The Plan of Allocation sets a deadline of April 15, 2004 for the filing of all claims

2. Subsequent to this date, the Plan of Allocation provides for a second notice to be sent to those entities that were sent the Notice and Claim Form approved by the Court that failed to submit a claim form. This second notice will inform these entities that they have 30 days from the date on the notice to file a claim.

3. Claims will be subject to audit and if a claim is reduced as a result of an audit, the claimant will be notified in writing, be given a chance to contest the reduction and be advised of their right to seek review of the reduction in this Court.

4. If a claim form is deficient, the claims administrator shall communicate with the claimant in order to remedy any curable defects and to advise the claimant of their right to review by this Court should their claim be denied.

5. The initial distribution of the net settlement funds will take place as soon as practicable after (1) a review of the claims forms by the Settlement Administrator and the determination of the amounts recommended to be paid to claimants; and (2) approval by this Court of the Settlement Administrator's recommendations.

#### 5. *Cooperation With Class Plaintiffs*

The PCA Defendants are required to cooperate with Plaintiff Classes in connection with the continued prosecution of the litigation. PCA Settlement ¶ 37. The Stone Defendants are required to cooperate with Plaintiff Classes only in the event that this Court fails to approve a settlement or settlements with another defendant or defendants and the litigation continues against that defendant or defendants. Stone Settlement ¶ 36. The terms of that cooperation are set forth in the settlement agreements.[7]

6. Class Counsel will recommend to the Court an initial disbursement of 90% of the new settlement funds with the remaining 10% being used as a contingency fund to pay such items as taxes due on interest earned, payment of any claims that are disputed for any reason and are subsequently determined by the Court to be approved claims and payment of any fees and expenses for the settlement administration. Subsequent to payment of these items, the remaining funds will be distributed to approved claims.

7. The net settlement funds shall be distributed on a pro rata basis to all approved claims based upon their approved purchases of corrugated containers and sheets in the United States from the Defendants during the period October 1, 1993 through November 30, 1995.

7. Paragraph 37 of the PCA Agreement and Paragraph 36 of the Stone Agreement both provide for the following types of cooperation:

a. if, in the course of depositions or preparing for trial, documents are identified that the Settling Defendants have not already produced, the Settling Defendants will produce such documents as are reasonably requested by Plaintiffs in so far as they are able to do so based upon reasonable good faith efforts;

b. produce or provide required certifications necessary to admit at trial documents produced by the Settling Defendants in so far as they are able to do so based upon reasonable, good-faith efforts

### 6. Most Favored Nation Clause for Settling Defendants

The PCA Settlement Agreement contains a most favored nations clause. PCA Settlement Agreement ¶¶ 38–40. The most favored nations clause in the agreement provides that if any subsequent settlement between the classes and any remaining defendants is more favorable than the PCA Settlement, the class will refund to PCA the difference. According to the terms of the agreement, "a settlement obtained by another Defendant or Defendants is deemed more favorable if the cash consideration that the classes obtain from the Defendant or Defendants is a smaller percentage of that Defendant's or Defendants' total sales of corrugated containers and corrugated sheets to Class Members during the Class Period, either individually or collectively, than the percentage of $43 million to Settling Defendants' sales." PCA Settlement Agreement ¶ 38. The parties agreed that the $43 million settlement equals 2.0 percent of the PCA Defendants' sales to Class Members during the Class Period whereas the Stone Settlement represents 1.62 percent of Smurfit Stone's sales to Class Members during the Class Period. That disparity triggered the $9 million reduction in the amount of the PCA Settlement-from $43 million to $34 million. The Stone Settlement Agreement does not contain a most favored nations clause.

### 7. Sales Out Provision

The PCA Defendants and the Stone Defendants are parties, along with the other defendants in the class case, to a judgment sharing agreement. PCA Settlement Agreement ¶¶ 41–44; Stone Settlement Agreement ¶ 37–40. The PCA Defendants share of any final judgment is set by this agreement at 11 percent and the Stone Defendants share is set at 33 percent. *Id.* Under this agreement, a verdict against the remaining defendants which includes damages based on the sales of either the PCA Defendants or the Stone Defendants will have to be reduced by 11 percent and 33 percent respectively before entry of judgment. The same result is required with respect to a settlement. *Id.*

### C. NOTICE TO THE CLASS

By Order dated January 6, 2004-the same Order that preliminarily approved the settlement agreements-the Court directed dissemination to the classes of notice of the settlements. On January 10, 2004, Class Plaintiffs, through the certified public accounting firm of Heffler, Radetich & Saitta L.L.P. ("Heffler"), mailed a total of 92,651 notices to members of the classes. *See* Affidavit of Michael T. Bancroft, CPA Regarding Dissemination of Notice to the Class ("Bancroft Aff.") ¶ 6. Summary notices were published in the national edition of *The Wall Street Journal* on January 20 and 26, 2004 and in the *Pulp & Paper Week* on January 19, 2004. *Id.* ¶ 10. The Notice and summary notices informed the class members of the background of the litigation including certification of the classes, the terms of the settlement agreements, distribution of settlement funds, the scheduling of the Fairness Hearing on March 26, 2004 and the right to object to the settlement prior to that date.

No class members filed objections to the settlement agreements. *Id.* The Court confirmed the absence of any objections to the settlement agreements at the March 26, 2004 hearing.

to identify and locate the author(s) of such documents.

## III. DISCUSSION

### A. APPLICABLE LAW

■ "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir.1975) (footnote omitted). In exercising that discretion, the Court is guided by Federal Rule of Civil Procedure 23(e). That rule provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed.R.Civ.P. 23(e). In determining whether to approve a class action settlement under Rule 23(e), " '... the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate.' " *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (further citation omitted)).

■ "Before sending notice of the settlement to the class, the court will usually approve the settlement preliminarily." *Id.* Such a preliminary determination requires the Court to consider the following factors: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Id.* (citing 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.41, at 11–91 (3d ed.1992)); *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D.Del.2002). If a court concludes, after consideration of those fac-

tors, that the settlement should be preliminarily approved, "... an initial presumption of fairness ..." is established. *In re Gen. Motors Corp.*, 55 F.3d at 785.

By Order dated December 8, 2003, the Court made a preliminary determination that the settlement was "... sufficiently fair, reasonable and adequate to authorize dissemination of notice to the classes." The Court must now finally decide whether the settlement agreements should be approved as fair, reasonable and adequate. That requires an analysis of the settlement agreements under the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).

■ In *Girsh*, the Court of Appeals adopted a nine-factor test to guide district courts in evaluating whether a class action settlement is fair, adequate and reasonable, as follows:

(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceeding and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh*, 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)); *see also In re Gen. Motors Corp.*, 55 F.3d at 785 (citing *Girsh* ). Upon consideration of each of the nine *Girsh* factors, the Court concludes

that the settlement is fair, adequate and reasonable.

## B. APPLICATION OF THE *GIRSH* FACTORS

### 1. *The Complexity, Expense and Likely Duration of the Litigation*

■ The first *Girsh* factor–the complexity, expense and likely duration of the litigation–"... is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *In re Gen. Motors Corp.*, 55 F.3d at 811 (quoting *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974)). As to the complexity of the case, "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Motorsports Merchandise Antitrust Litig.*, 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000); *see also In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov.18, 1983) (noting that "... antitrust price fixing actions are generally complex, expensive and lengthy" (citing *Grinnell*, 495 F.2d at 467–68)). "The legal and factual issues involved are always numerous and uncertain in outcome." *In re Motorsports*, 112 F.Supp.2d at 1337. This litigation was no exception.

As to the expense involved, Class Counsel submit in their Petition for Attorneys' Fees that they have expended 51,268 hours on this litigation. Langer Summary Declaration, at ¶¶ 6–11 and Declaration of David White, CPA. Plaintiffs' counsel have advanced over $1.45 million in costs in the case since its inception. *Id.* Had the case gone to trial and beyond to post-trial motions and appeal, those numbers would increase substantially.

Finally, as to the duration of the litigation, the case began in 1998 with the filing of several complaints in this District and the Northern District of Illinois. By Transfer Order dated February 12, 1999, the Judicial Panel on Multidistrict Litigation transferred all cases to this Court. The case is now in its sixth year and were it to go to trial could go on for any number of years. Based on the foregoing, the Court concludes that consideration of the first *Girsh* factor–complexity, expense and likely duration of this case–counsels in favor of approval of the settlement agreements.

### 2. *Reaction of the Classes to the Settlement*

■ The second *Girsh* factor–the reaction of the classes to the settlement–"'... attempts to gauge whether members of the class support the settlement....'" *In re Warfarin*, 212 F.R.D. at 254 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998)). No class members objected to either settlement. This fact strongly militates a finding that the settlement is fair and reasonable. "'[T]his unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement.'" *Fisher Bros. v. Phelps Dodge Industries*, 604 F.Supp. 446, 451 (E.D.Pa.1985) (Shapiro, J.) (quoting *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D.Ohio 1983)). While in some cases a lack of objections may reflect the absence of counsel or unfamiliarity with the legal system, in this case class members are represented by counsel. Further, the class in this cases involves many of the largest corporations in America–entities that are hardly unfamiliar with civil litigation. Based on the foregoing, the Court concludes that consideration of the second *Girsh* factor–reaction of the classes to the settlement–counsels in favor of approval of the settlement agreements.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

■ The third *Girsh* factor–the stage of the proceedings and the amount of discovery completed–instructs a court to approve a settlement only if the parties have an " 'adequate appreciation' " of the merits of the case. *In re Prudential*, 148 F.3d at 319 (quoting *In re Gen. Motors Corp.*, 55 F.3d at 813). That requires an analysis of the nature and depth of discovery. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 180 (E.D.Pa.2000). "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair." *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 588 (3d Cir.1999) (citing *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir.1993)).

The settlement agreements were reached in the fifth year of litigation after extensive informal discovery and discovery on class issues, and near completion of formal discovery. The settlement agreements are based upon significant fact-gathering and investigation into the legal issues. They were negotiated by counsel experienced in antitrust and class action matters. The negotiations involved face-to-face meetings and telephone conferences. The Court concludes that the parties conducted adequate investigation and discovery to gain an appreciation and understanding of the relative strengths and weaknesses of the claims and defenses asserted.

After inquiring into the negotiation process the Court is confident that there was no collusion. "A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D.Pa.1997) (internal quotation marks omitted) (cita-

tion omitted). The Court is therefore deferential to the reasoned judgment of the well-informed attorneys. *See Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 481 (E.D.Pa.1975). Based on the foregoing, the Court concludes that consideration of the third *Girsh* factor–the stage of the proceedings and the amount of discovery completed–counsels in favor of approval of the settlement agreements.

### 4–5. The Risks of Establishing Liability (4) and the Risks of Establishing Damages (5)

■ The fourth and fifth *Girsh* factors–the risks of establishing liability and the risks of establishing damages–require a court to " . . . balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. The Second Circuit has held that to assess risk in antitrust class action cases: "[T]he only truly objective measurement of the strength of plaintiffs' case is found by asking: 'Was defendants' liability *prima facie* established by the government's successful action?' " *Grinnell*, 495 F.2d at 455. The answer to that question is no because the FTC investigation went no further than Stone's alleged invitation to conspire and was resolved by consent decree. Thus, Class Plaintiffs did not benefit from an evidentiary record established through a government investigation and enforcement action.

Class Plaintiffs' discovery developed the following evidence of liability: substantial downtime taken by defendants in 1993, a reversal of a downward trend in pricing following closely the common downtime, parallel price increases, communications by defendant Stone with most defendants in a manner that could be construed to be an invitation to join in a downtime conspir-

acy, extraordinary inter-defendant sales of containerboard, and acknowledgment by most defendants of the positive effect of the downtime on prices. Class Plaintiffs' Memorandum at 18. On the negative side, there is no direct evidence of any meeting at which defendants agreed to take downtime or to raise prices and there was no direct evidence of conversations in which one conspirator agreed with another to take reciprocal downtime. *Id.* at 19. In addition, as the Court discussed in its Memorandum of December 8, 2003, the reduction in production caused by the alleged conspiratorial "downtime" accounted for a small quantity of linerboard. During the class period, October 1, 1993 through November 30, 1995 linerboard production by all defendants totaled 20,000,000 tons per year. The alleged conspiratorial downtime during that period produced a decease in production of 385,000 to 435,000 tons, or approximately 1 percent of production.

Moreover, in the period of alleged conspirational activity, the cost of pulp and old corrugated containers-the primary input costs of containerboard-rose at unprecedented rates. Class Plaintiffs' Memorandum at 31. Demand also rose during the period in question and defendants' production was unable to meet this increase. Class Plaintiffs' Memorandum at 32. The latter fact is explained in part by low prices in the 1980s and early 1990s that led to low returns on investment in additional capacity and thus reduced investment in additional capacity. *Id.* Defendants could have argued that it was this lack of capacity, not collusion, that prevented defendants from meeting this increased demand. *Id.* In sum, defendants would have been able to argue that these two economic forces-sharply rising costs and increased demand-contributed to the steep price increases more than the allegedly collusive downtime in 1993.

Taking these factors into account, and the substantial amount of formal and informal discovery in this action, Class Counsel concluded that they faced a genuine risk in proving liability and damages if they continued litigating against the Settling Defendants. Section 30.42 of the *Manual for Complex Litigation (Third)* counsels that a Court evaluating a class action settlement " . . . should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation." Based on the foregoing, consideration of the fourth and fifth *Girsh* factors--the risks of establishing liability and the risks of establishing damages--counsels in favor of approval of the settlement agreements.

### 6. The Risks of Maintaining the Class Action Through Trial

Under Federal Rule of Civil Procedure 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable. *In re School Asbestos Litig.,* 789 F.2d 996, 1011 (3d Cir.1986). While class certification is always conditional and may be reconsidered, *Rendler v. Gambone Bros. Dev. Co.,* 182 F.R.D. 152, 160 (E.D.Pa.1998), the parties do not identify any particular issue or circumstance in this case that might lead to a particular risk of decertification. Based on the foregoing, the Court concludes that consideration of the sixth *Girsh* factor--the risks of maintaining the class action through trial--does not counsel in favor of approval of the settlement agreements, but neither does it counsel against such approval.

### 7. The Ability of the Settling Defendants to Withstand a Greater Judgment

 The seventh *Girsh* factor requires the Court to determine " . . . whether the

defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant Corp. Litig.,* 264 F.3d 201, 240 (3d Cir.2001). Plaintiff Classes do not contend that the Settling Defendants do not have the financial resources to pay a larger judgment. However, Class Plaintiffs assert that "Smurfit Stone Container Corporation's financial condition at the time of settlement was certainly a factor that affected the ultimate amount of the settlement." Class Plaintiffs' Memorandum at 34. Specifically, Class Plaintiffs cite several press releases from Smurfit Stone announcing plant closures, reductions in the company's workforce and losses through the third quarter of 2003. Class Plaintiffs' Memorandum at 36. Class Plaintiffs also emphasize that the settlement with the Stone Defendants was greater than Smurfit Stone's earnings in any of the three years preceding the settlement and greater than their profits in that entire period. *Id.*

Assuming the Stone Defendants could pay greater amounts, there is nonetheless authority to approve the settlement. As an example, in *Lazy Oil Co. v. Witco Corp.,* 95 F.Supp.2d 290, 318 (W.D.Pa. 1997), the district court concluded that the settling defendant's ability to pay greater amounts was outweighed by the risk that the plaintiffs would not be able to achieve any greater recovery at trial. The Court agrees with the analysis of the court in *Lazy Oil* and concludes that this case is similar. Moreover, although Plaintiff Classes would be entitled to treble damages if successful at trial, the protracted nature of class action antitrust litigation means that any recovery would be delayed for several years, as trial on the cases originally assigned to this Court is not scheduled to commence until October 11, 2004. Based on the foregoing, the Court concludes that consideration of the seventh *Girsh* factor–the ability of the Settling De-

fendants to withstand a greater judgment–counsels in favor of approval of the settlement agreements.

### 8–9. *The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery (8) and the Range of Reasonableness of the Settlement Fund in Light of All the Attendant Risks of Litigation (9)*

The last two *Girsh* factors require a court to consider whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial. "In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Prudential,* 148 F.3d at 322 (quoting *In re Gen. Motors Corp.,* 55 F.3d at 806 (quoting *Manual for Complex Litigation (Second)* § 30.44, at 252)). Further, the fact that a proposed settlement may amount to a fraction of the best possible recovery does not, without more, mean that the proposed settlement is inadequate. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974).

Plaintiff Classes' expert constructed an econometric model and determined that over the class period, prices for boxes and sheets were 2.7 percent higher than they would have been absent the alleged conspiracy. See Affidavit of John C. Beyer, Ph.D. in Support of Settlement Agreement ("Beyer Aff.") ¶ 46. When this figure was multiplied by all nine defendants' sales, the result was total damages in the amount of $478 million over the class period. *Id.* at ¶ 50.

The sum of the PCA and Stone Settlements, $127 million without trebling, represents 58 percent of the damages attributable to the PCA and Stone Defendants for the entire class period. Class Plaintiffs' Memorandum at 38. The PCA and Stone Settlements represent 76 percent of the damages for the limitations period, i.e. from June 1994 to November 1995. *Id.* Total settlements with all defendant represent approximately 55 percent of total damages for the limitations period. *Id.*

Courts have approved settlements in cases where the percentages were substantially lower than in this case. *Lazy Oil,* 95 F.Supp.2d at 339 (court approved settlement amounting to 5.35 percent of damages for the entire class period and 25.5 percent of the of the damages falling within the limitations period); *In re Anthracite Coal Antitrust Litigation,* 79 F.R.D. 707, 714 (M.D.Pa.1978) (court approved settlement of 28 percent of estimated damages for four years); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 325 (N.D.Ga.1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.,* Civil No. 94–404, 1994 WL 485803 (W.D.Pa. Dec.23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); *Fox v. Integra Financial Corp.,* Civil Action No. 90–1504 (W.D.Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.,* 58 F.R.D. 19, 36–37 (W.D.Okla.1972) ($8 million settlement approved although claims exceeded $100 million); *Cagan v. Anchor Sav. Bank FSB,* [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,324 at 96,559, 1990 WL 73423 at *12–13 (E.D.N.Y. May 22, 1990) (approving $2.3 million settlement over objec-

tions that "best possible recovery would be approximately $121 million"); *Behrens v. Wometco Enterprises, Inc.,* 118 F.R.D. 534, 542 (S.D.Fla.1988) ("The mere fact that the proposed settlement of $0.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise"), *aff'd* 899 F.2d 21 (11th Cir.1990). Based on the foregoing, the Court concludes that consideration of the eighth and ninth *Girsh* factors–the range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund in light of all the attendant risks of litigation–counsel in favor of approval of the settlement agreements.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that consideration of the nine *Girsh* factors counsels in favor of approval of the settlement agreements. Accordingly, the Court grants Class Plaintiffs' Motion for Final Approval and approves the settlement agreements between the classes as certified by the Court and Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. and the settlement agreements between the classes as certified by the Court and Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation dated October 28 and 29, 2003, respectively, as fair, adequate and reasonable.

An appropriate Order follows.

## FINAL ORDER APPROVING SETTLEMENT AGREEMENT AND ENTRY OF JUDGMENT

**AND NOW,** this 21st day of April, 2004, upon consideration of Class Plaintiffs' Motion for Final Approval of the Settlements

with Defendants Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. ("PCA Settlement") and with Defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation ("Stone Settlement") (collectively "settlement agreements") (docket no. 328, filed March 22, 2004), following a hearing on March 26, 2004, pursuant to Notice to the Classes as certified by the Court, for the reasons set forth in the attached Memorandum, **IT IS ORDERED** as follows:

1. Notice of the Class Certification and settlement was disseminated to Class Members in conformance with the Plan of Notice approved by the Court by Order dated January 6, 2004 in accordance with Federal Rule of Civil Procedure 23(C)(2) and (e). The Notice fully and accurately informed Class Members of all relevant and material elements of the proposed Settlement Agreement and afforded them an adequate opportunity to object to the settlement. The Notice constituted the best notice practicable under the circumstances and constituted due and adequate notice to all Class Members;

2. Class counsel provided the Court with a Record of Potential Class Members Who Excluded Themselves from the Classes Certified by the Court. That Record of all such Class Members shall be appended to this Order and docketed by the Clerk of Court. A certified copy of the record of potential Class Members who timely excluded themselves from the classes shall be provided by the Clerk of Court to counsel for Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation;

3. The Court finds that the persons and entities listed in the attached Record of Potential Class Members Who Excluded Themselves from the Classes Certified by the Court, and no others, have timely excluded themselves from the classes and accordingly are not included in or bound by the Final Judgment entered pursuant to this Order;

4. Class Plaintiffs' Motion for Final Approval of the Settlements with Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation is granted. The settlement agreements are **APPROVED** pursuant to Federal Rule of Civil Procedure 23(e) as being fair, reasonable and adequate and in the best interest of the plaintiff classes as certified by the Court;

5. All claims against Class Plaintiffs' Motion for Final Approval of the Settlements with Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation asserted by Named Plaintiffs and Class Members who have not timely filed a notice of exclusion from the classes certified by the Court are **DISMISSED WITH PREJUDICE** and without costs;

6. Pursuant to the settlement agreements, Named Plaintiffs and all Class Members who have not timely filed a notice of exclusion from the classes are barred from instituting, assigning, maintaining, collecting, or prosecuting any other claims covered by this litigation in state or federal court or otherwise against Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation;

7. Neither the preceding paragraph nor any provision of the settlement agreements operates to release or bar any claims by the Named Plaintiffs or Class Members who have not timely filed a notice of exclusion from the classes against any person or entity other than Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation. The Named Plaintiffs and Class Members who have not timely filed a notice of exclusion from the classes fully reserve all claims against all persons and entities other than Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc. and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation;

8. Neither this Order nor the settlement agreements, nor any fact, conduct or act involving the settlement proceedings, shall be offered in, or received in, any proceeding as evidence, an admission, an inference or presumption, nor shall they constitute a finding of the validity or invalidity of any claim or defense or any cause of action alleged or pleaded in the litigation, except as may be necessary to enforce or consummate the settlement agreements or to support a defense of release or other theory of claim preclusion, issue preclusion or similar defense;

9. A Final Judgment is **ENTERED** disposing of the claims of Named Plaintiffs and Class Members who have not timely filed a notice of exclusion from the classes against *Packaging Corporation of America, Inc., Tenneco, Inc., and Tenneco Packaging, Inc.* and with Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation. Pursuant to Federal Rule of Civil Procedure 54(b), the Court determines that this Order constitutes a final judgment and that there is no just reason for delay;

10. Without affecting the finality of this Order, the Court retains exclusive jurisdiction over the implementation, enforcement, interpretation and performance of the settlement agreements. In doing so, the Court may enter additional orders to effectuate the fair and orderly administration of the settlement as may from time to time be appropriate;

As a result of the aforesaid rulings, **IT IS FURTHER ORDERED** as follows:

11. Defendants' Motion to Compel the Production of Facts Obtained from Third-Party Interviewees (docket no. 253, filed October 8, 2003) is **DENIED** as **MOOT**;

12. The Motion by Plaintiffs to Determine the Sufficiency of Stone and Smurfit Responses to Request to Admit, and to Compel Interrogatory Answer (filed under seal) (docket no. 260, filed October 22, 2003) is **DENIED** as **MOOT**;

13. Paragraph 1 of the Court's Order of October 21, 2003 directing Stone to complete production of mill fixed and variable cost data and box plant cost data by November 11, 2003 is **VACATED**; and

14. Paragraph 4 of the Court's Order of October 21, 2003 directing Class Plaintiffs to answer Defendants' contention interrogatories is **VACATED**.