Dwaine **PERRY**, Benita Perry and Candice K. Baier, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**FLEETBOSTON FINANCIAL CORP.,** d/b/a Fleet Credit Card Services, Defendant.

No. Civ.A. 04–0507.

United States District Court, E.D. Pennsylvania.

June 28, 2005.

See also 2004 WL 1508518.

---

James A. Francis, Francis & Mailman, PC, David A. Searles, Donovan Searles, LLC, Philadelphia, PA, for Plaintiffs.

Burt M. Rublin, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for Defendant.

### *MEMORANDUM AND ORDER*

SCHILLER, District Judge.

On February 4, 2004, Plaintiffs Dwaine Perry, Benita Perry and Candice Baier filed this action, on behalf of themselves and all others similarly situated, alleging that Fleet-Boston Financial Corporation ("Fleet") violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, by obtaining and reviewing their credit reports after they had declared bankruptcy and after their Fleet credit card accounts had been closed or cancelled. The parties eventually settled their differences with the aid of a mediator. On February 22, 2005, this Court preliminarily certified a settlement class and granted preliminary approval of the settlement agreement. On May 31, 2005, after notice was mailed to the class members and published nationally, the Court conducted a fairness hearing. The Court now grants final certification of the settlement class, approves the settlement, and awards attorneys' fees and costs.

### I. BACKGROUND

#### A. Nature and History of the Litigation

The Complaint alleged that although the individual class members maintained no relationship with Fleet, and had previous accounts with Fleet that had been closed and/or cancelled, Fleet had nonetheless obtained, reviewed and used their credit reports on multiple occasions. (Compl.¶¶ 14–16.) According to Plaintiffs, Fleet had no permissible purpose for accessing, obtaining, using or reviewing their credit reports during this time. (*Id.* ¶ 17.) Plaintiffs further alleged that Fleet obtained these credit reports under false pretenses, in violation of the FCRA. (*Id.* ¶¶ 20, 25.) Specifically, Plaintiffs leveled three allegations against Fleet: (1) Fleet violated 15 U.S.C. § 1681b by willfully and/or recklessly accessing Plaintiffs' credit files without a permissible purpose or authorization, (*id.* ¶ 36a); (2) Fleet violated 15 U.S.C. § 1681n by negligently accessing Plaintiffs' credit files without a permissible purpose or authorization, (*id.* ¶ 36b); and (3) Fleet violated 15 U.S.C. § 1681o by willfully and/or recklessly accessing Plaintiffs' credit files without a permissible purpose or authorization (*id.* ¶ 36c). Plaintiffs sought actual, statutory, and punitive damages, as well as costs, disbursements, and reasonable attorneys' fees. (*Id.* ¶ 37.)

On March 30, 2004, Fleet filed a motion to compel arbitration and stay proceedings pending completion of arbitration, pursuant to an arbitration·clause contained in Plaintiffs' amended cardholder agreements. In a Memorandum and Order dated July 6, 2004, this Court denied Fleet's motion, holding that the relevant provision in the cardholder agreements was ambiguous and could be read either to restrict Fleet's power to modify only those terms already contained or contemplated in the original agreement, or to both modify and insert additional, previously

uncontemplated, terms into the original agreement. *Perry v. FleetBoston Fin. Corp.,* Civ. A. No. 04–507, 2004 WL 1508518 (E.D.Pa. July 6, 2004). As Fleet drafted the agreements and was in the stronger bargaining position, this Court construed the agreements to allow Fleet to make unilateral changes to only those terms already contained or contemplated in the original agreement. *Id.* at *4. Because nothing in the agreements informed customers that Fleet might later mandate arbitration of disputes, particularly after Plaintiffs ceased using their cards, Fleet could not unilaterally alter the agreements to foreclose Plaintiffs from using the courts to sue Fleet. *Id.*

Fleet appealed this decision to the Third Circuit, which subsequently placed the lawsuit in its mediation program. (Mem. of Law in Supp. of Mot. for Final Approval of Class Action Settlement at 4 [hereinafter "Mem. in Supp. of Final Class Settlement"].) With the aid of a mediator, Joseph Torregrossa, Esquire, the parties spent two days in arm's-length negotiations, which resulted in the settlement agreement currently before the Court. On February 22, 2005, this Court issued an Order preliminarily certifying the following settlement class:

> All persons who had a Fleet credit card account between February 4, 2002 and February 11, 2005 whose credit reports were accessed or reviewed by Fleet after the account was closed or cancelled and after the indebtedness on the account was discharged in bankruptcy.

(*See* Order of Feb. 22, 2005 at 1.)

Pursuant to this Order, a "Notice of Proposed Settlement and Settlement Hearing" was sent to the 90,534 individuals who fit this description. (Mouck Aff. ¶ 2; Lerner Aff. ¶ 2.) The notice was mailed via U.S. First Class Mail on March 23, 2005. (Mouck Aff. ¶ 3; Lerner Aff. ¶ 2.) In addition, the notice was published in the March 29, 2005 edition of *USA Today.* (Mouck Aff. ¶ 4 & Ex. C.) In response, only seventy individuals requested exclusion from the class and no class member objected to the settlement. (Aff. of James A. Francis ¶¶ 4–5, attached as Ex. A to Mem. in Supp. of Final Class Settlement ["Francis Settlement Aff."].)

## B. TERMS OF THE SETTLEMENT

Under the terms of the settlement, Fleet agrees, inter alia, to the following:

a) to pay the cost of providing two free credit reports and credit scores from Trans Union to each Class member who submits a timely and properly completed Claim Form;

b) to make a $50,000 *cy pres* donation to a non-profit, legal, charitable or educational organization or entity;

c) to pay for all costs of notice and settlement administration;

d) for the one-year period commencing on the Effective Date of the settlement agreement, Fleet will take all reasonable efforts to ensure that it complies with the requirements of the FCRA by not making impermissible requests for credit reports of persons whom Fleet knows to have declared bankruptcy;

e) to instruct the three credit bureaus (Trans Union, Experian, and Equifax) to delete the Fleet trade line from the three named Plaintiffs' credit reports as soon as practicable after the Effective Date of the settlement.

(Mem. in Supp. of Final Class Settlement at 5–7.)

In exchange, the Plaintiffs agree, inter alia, to dismiss the lawsuit with prejudice, and class members who fail to timely exclude themselves from the class forever relieve Fleet from all claims arising from Fleet's alleged improper or impermissible access of their credit reports. (Proposed Final J. and Order of Dismissal, attached to Mot. for Final Class Settlement.)

Although the settlement agreement is not contingent upon the Court's approval of the full amount of counsel fees and incentive awards sought, Fleet has further agreed not to object to class counsel's application for $320,000 in attorneys' fees and out-of-pocket expenses and $5,000 in incentive awards to each of the three named Plaintiffs. (Mem. in Supp. of Final Class Settlement at 6.)

## II. CERTIFICATION OF THE CLASS

■ The Court must first analyze the status of the potential class and determine whether certification is appropriate. The Court has already provisionally certified a settlement class, a step that typically occurs when a court delays formal class certification until the parties have successfully negotiated a settlement. *See In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir.1995). Should discussions prove fruitful and a settlement be achieved, the court will then certify the class for settlement purposes only.[1] *Id.* Should negotiations fail to produce a settlement, defendant remains free to contest the existence of a class. *Id.*

■ A provisionally certified settlement class must still receive final district court approval. *Id.* at 797. Provided the requirements pertaining to class action settlements set forth in the Federal Rules of Civil Procedure are satisfied, a settlement class may be granted final certification. *See id.* ("[w]hile we approve the provisional certification of a settlement class to facilitate settlement discussions, final settlement approval depends on the finding that the class met all the requisites of Rule 23").

### A. Numerosity, Commonality, Typicality, Adequacy of Representation

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. As noted, this Court certified a "settlement only class." But this certification was necessarily provisional as the Court is required to conduct the appropriate legal analysis before a settlement class may be approved. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–21, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 308 (3d Cir.1998) ("[A] district court must find a class satisfies the requirements of Rule 23, regardless whether it certifies the class for trial or for settlement."); *General Motors*, 55 F.3d at 799 ("[a]ctions certified as settlement classes must meet the same requirements under Rule 23 as litigation classes."). Four prerequisites must be met for a lawsuit to be maintained as a class action: (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a) (2005); *see also In re LifeUSA Holding, Inc.*, 242 F.3d 136, 143 (3d Cir.2001). These four requirements are often referred to as numerosity, commonality, typicality, and adequacy of representation.

#### 1. Numerosity

■ This requirement seeks to determine whether "the putative class is so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir.2001). While there is no precise number of putative class members that will ensure the numerosity requirement is met, a potential class exceeding forty members is generally considered sufficient. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir.2001); *see also Serventi v. Bucks Technical High Sch.*, 225 F.R.D. 159, 165 (E.D.Pa.2004) (class contained at least forty-seven potential members); *Godshall v. The Franklin Mint Co.*, Civ. A. No. 01–CV–6539, 2004 WL 2745890, at *2 (E.D.Pa. Dec.1, 2004) (proposed class consisted of 112 members). Here, Fleet mailed notices to 90,534 potential class members. Accordingly, there is no doubt that wherever the numerosity threshold may lie, the number of potential class members here has crossed that line.

#### 2. Commonality

■ This requirement is met when the named plaintiffs share "at least one question

---

1. It is beyond doubt that settlement classes are an acceptable device at a court's disposal in the class action realm. *General Motors*, 55 F.3d at 794 (explicitly recognizing settlement classes under Rule 23); 4 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 11.27 (4th ed.2002) [hereinafter "NEWBERG"] ("the parties may stipulate that [the litigation] be maintained as a class action for the purpose of settlement only."); MANUAL FOR COMPLEX LITIGATION § 21.132 (4th ed.2005).

of fact or law with the grievances of the prospective class." *Stewart*, 275 F.3d at 227 (*quoting Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994)); *Godshall*, 2004 WL 2745890, at *2 ("Generally this requirement is satisfied when the defendant has engaged in the same conduct towards members of the proposed class."). Commonality is likely to be found when plaintiffs assert an economic, as opposed to a physical, injury because few if any individual proof issues are expected to arise. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir.2004). Courts in this district have found the commonality requirement satisfied in debt collection cases when the "defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents." *Bonett v. Educ. Debt Servs., Inc.*, Civ. A. No. 01–6528, 2003 WL 21658267, at *2 (E.D.Pa. May 9, 2003) (*quoting Saunders v. Berks Credit & Collections, Inc.*, Civ. A. No.00–3477, 2002 WL 1497374, at *6 (E.D.Pa. July 11, 2002)); *see also Orloff v. Syndicated Office Sys., Inc.*, Civ. A. No. 00–5355 2004 WL 870691, at *4 (E.D.Pa. Apr. 22, 2004); *Schilling v. Let's Talk Cellular & Wireless*, Civ. A. No. 00–3123, 2002 WL 391695, at *1 n. 1 (E.D.Pa. Feb.6, 2002).

This appears to be the first case seeking class certification based on the theory of liability proffered by Plaintiffs. Yet there seems to be no question that Fleet's conduct toward the individual class members was uniform. While there are no allegations that Fleet mailed a standard debt collection letter to class members, the Court finds that Fleet treated the class members in a standardized fashion by obtaining and reviewing their credit reports. Accordingly, the commonality requirement is satisfied.

*3. Typicality*

■ The typicality requirement examines "whether the named Plaintiff's individual circumstances are markedly different [from those of unnamed class members] or ... the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770,

786 (3d Cir.1985) (*quoting Weiss v. York Hosp.*, 745 F.2d 786, 809 n. 36 (3d Cir.1984)); *see also Baby Neal*, 43 F.3d at 57–58 (internal citations omitted). As the name implies, typicality does not require that putative class members share identical claims. *Warfarin*, 391 F.3d at 531–32. "The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D.Pa.1994). When the named plaintiffs and putative class members seek to challenge the same allegedly unlawful conduct, the typicality requirement is usually deemed satisfied even though different fact patterns may underlie the individual claims. *Serventi*, 225 F.R.D. at 165 (typicality met when same unlawful conduct affects both named plaintiffs and putative class irrespective of the varying fact patterns underlying the individual claims); *see also Godshall*, 2004 WL 2745890, at *2 (typicality requirement met when all class members would rely upon the same legal theory to establish liability). As all class members would rely upon the FCRA to establish that Defendant improperly sought and reviewed each putative class member's credit report, the typicality requirement is clearly met here.

*4. Adequacy of Representation*

■ This requirement ensures that the named plaintiffs fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a)(4). The Court must be satisfied that: (a) plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation; and (b) the interests of the named representatives are not antagonistic to those of other class members. *See generally, Warfarin*, 391 F.3d at 532; *see also General Motors*, 55 F.3d at 800–01.

■ I and a number of my colleagues have previously found that class counsel, Francis & Mailman, P.C. and Donovan Searles LLC, possesses the skill, experience and qualifications necessary to conduct litigation similar to the present lawsuit. *Oslan v. Collection Bureau of Hudson Valley*, 206 F.R.D. 109, 112 (E.D.Pa.2002); *see also, e.g., Orloff*, 2004 WL 870691, at *4 (Surrick, J.);

*Bonett,* 2003 WL 21658267, at *3 (Davis, J.); *Saunders,* 2002 WL 1497374, at *8 (DuBois, J.). I see no reason to contradict these decisions. Moreover, no conflict between the interests of the named Plaintiffs and those of the other class members has been brought to the attention of the Court, nor can I discern any such conflict. Therefore, the adequacy of representation prerequisite is satisfied.

## B. The Maintainability of the Class Action

■ In addition to meeting the four requirements of Rule 23(a), a proposed class must also qualify under one of the three subparts of Rule 23(b). *Warfarin,* 391 F.3d at 527. Here, Plaintiffs seek to maintain this class action under Rule 23(b)(3) which permits for class action lawsuits when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

The issue of predominance "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Bonett,* 2003 WL 21658267, at *4 (*quoting Amchem,* 521 U.S. at 623, 117 S.Ct. 2231). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. Indeed, predominance is normally satisfied when plaintiffs have alleged a common course of conduct on the part of the defendant. *Prudential,* 148 F.3d at 314–15. As Plaintiffs have alleged such a common course of conduct here, the Court finds that the predominance requirement is satisfied.

The superiority requirement is also met. Given the relatively small amount of money at stake when considering each claim separately, it is unlikely that class members would elect to file individual lawsuits against Fleet. It would also be terribly inefficient to maintain thousands of lawsuits against Fleet based on similar factual predicates and the same legal theories.. Therefore, a class action is clearly the superior method for adjudicating this controversy.

Accordingly, the Court grants final certification of the class.

## III. NOTICE TO THE CLASS

■ After granting provisional class certification in February of 2005, the Court directed that notice be sent to potential class members in accordance with Rule 23(c)(2)(B). This provision demands that potential class members be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B). Due process requires that class members receive adequate notice because they are bound by the judgment entered in the action. *Fry v. Hayt, Hayt & Landau,* 198 F.R.D. 461, 474 (E.D.Pa.2000). This Court's February 22, 2005 Order instructed that Defendant mail the class notice and claim form "to all members of the class at their last known address as reflected in the computer records of Fleet." (Feb. 22, 2005 Order ¶ 7.) Furthermore, the Court ordered that "within five (5) business days of mailing of the Class Notice, [ ] Summary Notice [ ] shall be published once in a national edition of *USA Today.*" *Id.*

■ Plaintiffs have provided ample evidence of their compliance with this Order. (*See* Mouck Aff. ¶¶ 3–4; Lerner Aff. ¶ 2; Francis Settlement Aff. ¶ 3.) Individual notice was mailed to the 90,534 individuals whose names appear on Fleet's records. (Mouck Aff. ¶¶ 2–3.) Prior to mailing, the individuals' addresses were updated by running them through the Postal Service's National Change of Address database. (*Id.* ¶ 2.) Moreover, should some individuals not have received this mailing, they were sufficiently notified by publication. (Mouck Aff. ¶ 4 & Ex. C.) Notice published in *USA Today,* provided it meets the requirements set forth in Rule 23(c), is an acceptable method of informing the class about a settlement. *See Fry,* 198 F.R.D. at 475; *see also Montgomery v. Beneficial Consumer Disc. Co.,* Civ. A. No. 04–2114, 2005 WL 497776, *6 (E.D.Pa. Mar.2, 2005) (individual mailing coupled with publication in *USA Today,* "the nation's larg-

est daily newspaper," qualified as best notice practicable under the circumstances). Accordingly, the notice in this case clearly comports with both Rule 23 and the mandates of the due process clause. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.,* 758 F.2d 86, 90 (3d Cir.1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirement of both Fed.R.Civ.P. 23 and the due process clause.") (citations omitted).

## IV. FAIRNESS OF THE SETTLEMENT

▉▉▉ Rule 23(e) directs that the court approve any settlement of a class action. FED. R. CIV. P. 23(e). Prior to approval, the court must conduct a hearing and decide whether the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(1)(C); *see also Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir.1983). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975). The law looks favorably upon class action settlements because avoiding a trial conserves scarce judicial resources. *General Motors,* 55 F.3d at 784. The advantages to settlement increase when settlement also avoids a battle over class status. *Id.* Of course, the Court's discretion is not unfettered as "the district court acts as a fiduciary who serves as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *Id.* at 785 (*quoting Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975)).

▉▉▉ Having given its initial blessing to the proposed settlement, directed notice be provided to class members, and conducted a fairness hearing, the Court must now decide whether the settlement should be approved as fair, reasonable and adequate. This decision is guided by the nine-factor test set forth by the Third Circuit in *Girsh.* The *Girsh* test directs district courts to examine: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater settlement; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation. *Girsh,* 521 F.2d at 157 (internal citations omitted).

### A. Complexity, Expense, and Duration of Litigation

▉▉▉ This factor aims to capture the monetary costs and time involved in pursuing the litigation to trial and beyond. *See In re Linerboard Antitrust Litig.,* 321 F.Supp.2d 619, 629 (E.D.Pa.2004); *see also General Motors,* 55 F.3d at 812. Here, settlement allows both the class and the Defendant to avoid all the obstacles of protracted litigation. Considerable time, money and resources can be saved by approving the settlement. Moving forward with the litigation would surely involve the filing of numerous briefs and motions. Both sides would zealously present their positions throughout the course of the litigation and trial with neither side certain of the outcome. *See generally* Mem. in Supp. of Final Class Settlement (citing numerous legal and factual differences between the parties). Indeed, the parties have already battled over whether this matter must be arbitrated, which serves as a precursor to the battle on the merits that would surely ensue without settlement. Appeals would then almost certainly follow whatever outcome was reached. For all of these reasons, the Court finds that this first factor weighs in favor of the proposed settlement.

### B. Reaction of the Class to the Settlement

This factor examines whether the class supports the settlement. *Warfarin,* 391 F.3d at 536; *see also Prudential,* 148 F.3d at 318. Silence from the class is generally presumed to indicate agreement with the settlement terms. *General Motors,* 55 F.3d at 812 (*citing Bell Atlantic Corp. v. Bolger,* 2 F.3d

1304, 1313 n. 15 (3d Cir.1993)). "Generally, if the class members do not oppose the class settlement, the court is justified in concluding that they consider it fair and reasonable." *Lachance v. Harrington*, 965 F.Supp. 630, 645 (E.D.Pa.1997) (citations omitted).

Notice was mailed to 90,534 class members, only seventy of whom opted out. (Francis Settlement Aff. Ex. A.) Furthermore, not a single class member objected to the proposed settlement. (Francis Settlement Aff. ¶ 5; *see also* Mem. in Supp. of Final Class Settlement at 7.) Such a response (or lack thereof) weighs greatly in favor of approving the settlement. *See, e.g., Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir.1990) (settlement favored when only twenty-nine out of 281 class member objected); *Stoner v. CBA Info. Servs.*, 352 F.Supp.2d 549, 552 (E.D.Pa.2005) (eighteen opt-outs and five objectors in a class of 11,980 indicated "a more than favorable class reaction"); *Oslan v. Law Offices of Mitchell N. Kay*, 232 F.Supp.2d 436, 442 (E.D.Pa. 2002) ("It is indicative of the settlement's fairness that only one member opted out and that no member of the Class filed an objection at the Final Approval Hearing.").

### C. The Stage of the Proceedings and the Amount of Discovery Completed

The third *Girsh* factor considers the current stage of the proceedings and the lawyers' knowledge of the strengths and weaknesses of their case. "Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Yong Soon Oh v. AT & T Corp.*, 225 F.R.D. 142, 149 (D.N.J. 2004); *see also Serventi*, 225 F.R.D. at 167. Here, counsel have gained such an appreciation through their exchange of some discovery and through their participation in two mediation sessions with Joseph Torregrossa, mediator for the Third Circuit. Furthermore, the Court is satisfied that the settlement is the product of arm's-length negotiation and therefore gives considerable weight to the views of experienced counsel as to the merits of the settlement. *See Bonett*, 2003 WL 21658267, at *6 (court deferred to views of informed counsel where there was no col-

lusion as to settlement terms); *see also Saunders*, 2002 WL 1497374, at *10 ("The Court is therefore deferential to the reasoned judgment of the well-informed attorneys."); *Lake v. First Nationwide Bank*, 900 F.Supp. 726, 732 (E.D.Pa.1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.").

### D. The Risks of Establishing Liability

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *General Motors*, 55 F.3d at 814. In examining this factor, the Court need not delve into the intricacies of the merits of each side's arguments, but rather may "give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Lachance*, 965 F.Supp. at 638. Class counsel candidly admits that victory is far from a foregone conclusion, as Fleet would argue that the FCRA permits creditors to access the credit reports of customers to determine whether they can still meet the obligations of the account and/or to make adjustments to a customer's credit line. (Mem. in Support of Final Class Settlement at 11.) Plaintiffs would also be required to show Fleet acted willfully, a contention that Fleet "would vigorously oppose." (*Id.* at 12.) Given the risks that the class faces, this factor weighs in favor of the proposed settlement.

### E. The Risks of Establishing Damages

"[T]his inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." *General Motors*, 55 F.3d at 816. Even if Plaintiffs obtain a favorable jury verdict on the issue of liability, Plaintiffs are highly unlikely to receive significant damages from this litigation. It is not clear that the class members suffered any actual damages. The account reviews conducted at Fleet's request do not appear on any credit reports used by potential credit issuers. In other words, only the

inquirer, the credit bureau and the consumers are made aware of Fleet's inquiry. (Mem. in Supp. of Final Class Settlement at 12.) Furthermore, in order to recover statutory damages, Plaintiffs must show that Fleet willfully failed to comply with the dictates of the FCRA. 15 U.S.C. § 1681n; *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 23 n. 2, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). As Fleet argued that it did not violate the FCRA, let alone willfully commit a violation, the class would have difficulty establishing damages of any kind. *See Stoner*, 352 F.Supp.2d at 552.

### F. The Risks of Maintaining the Class Action Through Trial

What the district court giveth, the district court may taketh away: the court may decertify or modify a class at any time during the litigation should the class prove to be unmanageable. *Linerboard*, 321 F.Supp.2d at 631 (*citing In re School Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir.1986)); *see also Rendler v. Gambone Bros. Dev. Co.*, 182 F.R.D. 152, 160 (E.D.Pa.1998) (class certification is always conditional and subject to reconsideration by the court). The maintenance of this litigation as a class action could be difficult should the Third Circuit decide that the arbitration clause must be enforced. Under those circumstances, Plaintiffs argue, Fleet would likely contend that individual class members would be barred from pursuing their claims as a class, since the arbitration clause contains a class action waiver provision. (Mem. in Supp. of Final Class Settlement at 9 (*citing Johnson v. West Suburban Bank*, 225 F.3d 366, 369 (3d Cir.2000) (proceeding as a class is a procedural right that may be waived by agreeing to an arbitration clause)). This factor therefore weighs in favor of the proposed settlement.

### G. The Ability of the Settling Defendants to Withstand a Greater Judgment

Fleet could certainly withstand a much larger judgment as it has considerable as-

sets. While that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages. *See Oh*, 225 F.R.D. at 150–51 ("There is no question that being the large conglomerate that it is, [AT & T] could have withstood a significantly greater judgment ... [however] the difficulties the plaintiffs would have had in certifying a damages class and proving damages diminish the importance of this factor here.").

### H. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery

This factor compares the present value of the damages plaintiffs would likely recover if successful in litigation, discounting for the risk of not prevailing, against the amount of the proposed settlement. *General Motors*, 55 F.3d at 806. The Court may give credence to the opinions of experienced attorneys in assessing this comparison. *Orloff*, 2004 WL 870691, at *7 (citation omitted).

Here, class counsel asserts that the value of the proposed settlement outweighs the mere possibility of future relief. (Mem. in Supp. of Final Class Settlement at 14.) Although the settlement does not provide individual class members with a monetary recovery (aside from the incentive awards provided to the named Plaintiffs), the settlement nonetheless provides them with a substantial benefit. Plaintiffs' credit reporting expert, Evan Hendricks, opines that the settlement is reasonable and that the class benefits in important ways.[2] This Court agrees. According to Hendricks, one benefit of the settlement is the education it offers class members as to their credit reports and credit scores. (Pls.' Expert Witness Report at 5.) Furthermore, the settlement provides class members with two free credit reports and two free credit scores.

---

**2.** Hendricks is the editor/publisher of a newsletter that reports on privacy and information law; has testified before Congress numerous times on the issue of credit reporting; has served as an expert witness in numerous FCRA cases; and

has earned an FCRA certification from the National Credit Reporting Association. (Pls.' Expert Witness Report at 17–19 (Hendricks's curriculum vitae).)

(*Id.*) As Hendricks notes, one way to value the settlement is to multiply the cost of the two free credit scores and two free credit reports by the size of the class.[3] Under this equation, the value of the two free credit scores and two free credit reports is $2,797,500.60.[4] Although the Court has serious reservations with equating the cost of the credit reports and credit scores to the value of the benefit to the class, the Court recognizes that examining the market value of these items is one method of placing a value on the settlement in light of the best possible recovery. This is particularly true because class members could not rightfully expect to receive large individual monetary damages and because the Court must discount for the risk of not prevailing. Therefore, the Court concludes that this factor weighs slightly in favor of settlement.

### I. The Range of Reasonableness of the Settlement Fund in Light of the Attendant Risks of Litigation

"This factor requires the court to examine the terms of the settlement from a 'slightly different vantage point[ ]'—than reasonableness in light of the best recovery." *Oslan*, 232 F.Supp.2d at 444 (*quoting General Motors*, 55 F.3d at 806).

The risks of litigation are particularly weighty here, on the issues of both liability and damages. Further complicating matters is the fact that "no reported class action cases have ever been brought or classes certified under the theory [used by Plaintiffs in this case]." (Mem. in Supp. of Final Class Settlement at 5.) The Court concludes that, given the circumstances, the settlement is within the range of reasonableness in light of the attendant risks of litigation.

### V. THE *CY PRES* DONATION

■ One portion of the settlement warrants special examination: the provision for a $50,000 *cy pres* donation to an "appropriate non-profit, legal, charitable or educational organization or entity." (Mem. in Supp. of Final Class Settlement at 6.) *Cy pres* distributions, normally used to disburse the residual funds from unclaimed awards to class members, are not without their critics. *See, e.g.*, George J. Krueger & Judd A. Serotta, Class Action Reform and the Problem of Civil Judicial Confiscation, THE LEGAL INTELLIGENCER, Mar. 10, 2005, at 7. Nevertheless, as recognized by a leading class action treatise, "[w]hile the use of a *cy pres* distribution remains controversial and unsettled in an adjudicated class action context, courts are not in disagreement that *cy pres* distributions are proper in connection with a class settlement, subject to court approval of the particular application of the funds." 4 NEWBERG § 11.20. Accordingly, "even in circuits that have ruled that *cy pres* or fluid class recovery distributions are not valid in contested adjudications, these distributions have obtained a stamp of approval as part of a class settlement." *Id.; see also Does I v. The Gap, Inc.*, Civ. A. No. 01–0031, 2002 WL 1000073 (D.N. Mar. I. May 10, 2002) (granting preliminary approval of settlement that included *cy pres* fund); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir.1990) ("Federal courts have frequently approved this remedy in the settlement of class actions where proof of individual claims would be burdensome or distribution of damages costly.").

A *cy pres* donation, as part of the settlement in the instant litigation, is appropriate. The individual claims of the class members are quite small, perhaps too small to justify individual litigation. "[C]onsumer wrongs often result in claims that are too small to justify individual litigation. In such cases, unless an effective class action right is available, no judicial means of individual redress would be available as a practical matter." 2

---

**3.** Individual credit scores are valued at $5.95 and individual credit reports are valued at $9.50. (Pls.' Expert Witness Report at 12, 15.)

**4.** Hendricks points out that the law will soon entitle all Americans to one free copy of their credit report from each of the three major credit reporting associations. (*Id.*) Although Hendricks recognizes that this new entitlement justifies a decrease in the value of the settlement to the class, *see id.* at 5, Hendricks recommends that people check their credit reports more than once a year. (*See id.* at 7.) Accordingly, he still believes there to be value in the benefit conferred by the settlement.

NEWBERG § 5:48. Under these circumstances, rather than allowing possible wrongdoing to continue unabated, recovery under a *cy pres* theory helps address those wrongs. *Id.; see also In the Matter of Mexico Money Transfer Litig.,* 267 F.3d 743 (7th Cir.2001) (affirming adequacy of settlement when class members received no cash benefits but, inter alia, *"cy pres* relief" to organizations that assist the Mexican–American community).

This litigation seeks to remedy a problem that does not lend itself to large money damages; without the tool of class action litigation this problem might go unaddressed. Still, the dearth of money damages available for individual class members leads to potential distribution problems, and could easily become an obstacle to settlement. Furthermore, by ordering that the *cy pres* donation be made to the Consumer Bankruptcy Assistance Project and the Consumer Credit Counseling Service of Delaware Valley, whose aims include representing indigent clients seeking to obtain the protection of the bankruptcy court and educating the public about the responsible use of credit, respectively, the settlement will help address the problems that necessitated the filing of this lawsuit originally. Therefore, a *cy pres* distribution, as part of the overall settlement, is a creative and useful means of achieving a fair and reasonable resolution.

## VI. INCENTIVE AWARDS

■ Payment awards to class representatives lie within the discretion of the trial court and may be provided as a reward for the benefit visited on the class. *In re Plastic Tableware Antitrust Litig.,* Civ. A. No. 94–3564, 1995 WL 723175, at *2 (E.D.Pa. Dec. 4, 1995). Factors that courts consider when awarding incentive awards include: the risk to the plaintiff in commencing suit, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in his capacity as a member of the class. *Id.* (*citing In re*

*U.S. Bioscience Secur. Litig.,* 155 F.R.D. 116, 121 (E.D.Pa.1994)); *see also Godshall,* 2004 WL 2745890, at *6. The $5,000.00 to be awarded to each of the three named Plaintiffs is in line with awards in similar class action litigation. *See Bonett,* 2003 WL 21658267, at *7 (approving $4,000.00 award to class representative in Fair Debt Collection Practices Act class action litigation); *see also Orloff,* 2004 WL 870691, at *7 (approving $5,000.00 award to plaintiff as class representative); *Oslan,* 232 F.Supp.2d at 445 (granting $1,000.00 to named plaintiff in FDCPA case).

Although this case has not been front page news, the records class counsel has submitted in support of the petition for attorneys' fees indicates that the named Plaintiffs have expended significant time and resources for the benefit of the class. This litigation has been pending for over a year and the named Plaintiffs are entitled to the additional benefits conferred by an incentive award. Therefore, the Court approves the $5,000.00 incentive awards for each of the three named Plaintiffs.

## VII. ATTORNEYS' FEES AND EXPENSES

### A. Overview

Under the Federal Rules of Civil Procedure, "[i]n an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by law or by agreement of the parties ..." FED. R. CIV. P. 23(h) (2005). This Court must conduct a "thorough judicial review" of class counsels' request for attorneys' fees in this matter. *See General Motors,* 55 F.3d at 819; *see also Prudential,* 148 F.3d at 333. The party requesting fees must demonstrate the reasonableness of its request, and therefore must submit evidence that supports its request. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

■ Courts in this Circuit employ one of two methods for calculating attorneys' fees in the class action context. The lodestar method, normally applied in statutory fee shifting cases, multiplies the number of hours reason-

ably worked by a reasonable hourly rate. *Saunders*, 2002 WL 1497374, at *15; *see also Lake*, 900 F.Supp. at 734. A court determines a reasonable hourly rate by assessing the experience and skill of the prevailing party's attorneys and by looking at the market rates in the relevant community for lawyers of reasonably comparable skill, experience and reputation. *See Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir.2001); *see also Student Pub. Interest Research Group of N.J., Inc. v. AT & T Bell Labs.*, 842 F.2d 1436, 1450 (3d Cir.1988). The lodestar method is appropriate where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." *Saunders*, 2002 WL 1497374, at *15 (*quoting General Motors*, 55 F.3d at 821); *see also Rite Aid Sec. Litig.*, 396 F.3d 294, 300 (3d Cir.2005). Therefore, this method may work best when a settlement secures rights that are difficult to calculate, even if a de facto common fund exists. *Lake*, 900 F.Supp. at 734 (citations omitted); *see also Ciccarone v. Marchese*, Civ. A. No. 03–1660, 2004 WL 2966932, at *4 (applying lodestar method in FCRA class action litigation because equitable and monetary relief made available to class defied precise monetary calculation).

The percentage-of-recovery method, on the other hand, awards class counsel a fixed portion of the settlement fund. Under this method, courts determine an appropriate fee for class counsel by examining the size of the settlement fund, any objections to the fee request, counsel's skill and efficiency, the complexity of the litigation and the amount of time counsel spent on it, the risk of nonpayment, and awards in similar cases. *Stoner*, 352 F.Supp.2d at 552–53 (*citing Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir.2000); *see also Godshall*, 2004 WL 2745890, at *5. The percentage-of-recovery method is preferred when the fee is to be paid from a common fund. *Id.*, 2004 WL 2745890, at *5 (*citing Prudential*, 148 F.3d at 333); *see also Lake*, 900 F.Supp. at 734 ("In situations where counsel and the class share a common fund, or where the fee and the settlement are claimed to be independent of each other, but actually derive from the same source, a percentage of the total recovery is

more appropriate."). This method is generally favored in common fund cases because it permits courts to grant fees "in a manner that rewards counsel for success and penalizes it for failure." *Rite Aid Sec. Litig.*, 396 F.3d at 300 (*quoting Prudential*, 148 F.3d at 333). Generally, these awards range from nineteen percent to forty-five percent of the settlement fund. *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 533 (E.D.Pa.1990).

Neither method is mandatory, leaving the district court with a wide range of discretion when selecting which method to employ. *Lake*, 900 F.Supp. at 734. "In hybrid cases which share the attributes of both a statutory fee case and a common fund case, it is within the district court's discretion to make a particularized determination as to whether the case more closely resembles a common fund case or a statutory fee case." *Brytus v. Spang & Co.*, 203 F.3d 238, 248 (3d Cir.2000) (Stapleton, J., dissenting). While the trial court retains the discretion to select either method, it is wise for the court to use a second method of calculation to ensure the correctness of its initial calculation. *See Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, Civ. A. No. 03–4578, 2005 WL 1213926, at *15 (E.D.Pa. May 19, 2005) (citations omitted); *see also Saunders*, 2002 WL 1497374, at *14 (citations omitted).

Regardless of which method the Court chooses, it must be mindful that it acts as a fiduciary that must protect the interests of the class and must also be certain of avoiding even the appearance of providing windfall fees to attorneys. *See Rite Aid Sec. Litig.*, 396 F.3d at 307 ("At the fee determination stage, the district judge must protect the class's interest by acting as a fiduciary for the class."); *Stop & Shop*, 2005 WL 1213926, at *7–*8 ("In examining a motion for award of attorneys' fees from a common fund, the Court also seeks to protect the public interest and, with it, the integrity of the judicial system ..."); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469 (2d Cir. 1974) ("For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the court should avoid awarding windfall fees

and that they should likewise avoid every appearance of having done so.") (internal quotation omitted).

## B. The Appropriate Method for this Litigation

■ Class counsel urges this Court to apply the percentage-of-recovery method and award $320,000.00 in attorneys' fees and costs for the prosecution of this litigation. Even assuming this case could be termed as a common fund case, the Court rejects this request and instead will apply the lodestar method. While this class action may share some aspects with the typical common fund case, this Court simply cannot ignore some important distinctions that demand application of the lodestar method to the fee request.[5]

Perhaps the most obvious difference is that Plaintiffs have not recovered a fund of money from which individual class members will be awarded damages. Rather, each class member will have to fill out a claim form to secure the right to receive two free credit reports and two free credit scores. Therefore, this is far from the typical common fund case where each individual class member is entitled to a portion of a lump-sum paid by a defendant. Additionally, any attorneys' fees paid to class counsel will not come from any pool of funds created (as none exists), but rather will be paid separately by Fleet.

Furthermore, the benefits to the class simply do not lend themselves to any precise measurement. While Plaintiffs' expert, Evan Hendricks, estimates the value of two free credit reports and two free credit scores to be $2,797,500.60, he also recognizes that "the Court could determine that various factors dictate that for purposes of class valuation, the two credit reports only retain a portion of their market value." (Pls.' Expert Witness Report at 5.) One such factor is the recently enacted amendments to the FCRA, which by September 1, 2005 will entitle all Americans to one free copy of their credit report from each of the three major credit reporting agencies. (*Id.* at 6.) These amendments decrease the value of the settlement.

The settlement provides other benefits to the class that prove even more difficult to quantify than the free credit reports and free credit scores. Fleet has agreed to "take all reasonable efforts to ensure that it complies with the requirements of the FCRA by not making requests for credit reports of persons who have declared bankruptcy unless it has a permissible purpose under the FCRA to do so." (*Id.*) The Court concurs with Hendricks's opinion that this provision of the settlement will protect consumer privacy by causing "Defendant to ensure that it does not indiscriminately pull the credit reports of customers or ex-customers who filed bankruptcy." (*Id.* at 15.) This is certainly a valuable piece of the settlement and an important concession on the part of Fleet, yet the Court simply cannot place a dollar amount on that concession.

The same is true for another benefit that Hendricks cites: education of the class. There is great value in informing class members that they are entitled to learn the information contained in their credit reports and credit scores. It is also important that class members are notified that their credit information was possibly impermissibly accessed. Hopefully, this litigation will raise consumer awareness of privacy and credit issues and therefore force banking institutions to meet higher standards of honesty, integrity and customer service.

Furthermore, class actions were designed in part to address exactly the type of societal grievance at issue in this case. Counsel might find itself reluctant to bring socially beneficial class action litigation should fee awards provide minuscule compensation based on the method applied by district courts. *See Saunders,* 2002 WL 1497374, at *15.

For all of the above reasons, the Court will use its discretion and apply the lodestar method of calculating attorneys' fees.

---

**5.** Although not dispositive of the issue, the FCRA contains a fee-shifting provision, which normally leads courts to use the lodestar method. *See* *General Motors,* 55 F.3d at 821 ("Courts generally regard the lodestar method ... as the appropriate method in statutory fee shifting cases.").

## C. The Lodestar

### 1. Calculating the Lodestar for Francis & Mailman, P.C.'s Attorneys and Staff

■ James A. Francis seeks $39,884.00 based on 135.2 hours worked at a rate of $295.00 an hour. (Francis Att'ys' Fees Decl. ¶ 6, attached as App. 1 to Mot. for Atty's' Fees.) Mark D. Mailman seeks $9,145.00 based on 31.0 hours worked, also at a rate of $295.00 an hour. (*Id.*) Both attorneys have been certified to act as class counsel on a number of matters pending both in the Eastern District of Pennsylvania and other federal courts. (Mot. for Att'ys' Fees App. 1 Ex. D (Biographies of Francis & Mailman).) Both possess significant skill and experience in consumer class action litigation and courts in this district have approved similar hourly rates for them. *See Orloff*, 2004 WL 870691, at *7 (approving rates of $170.00—$235.00 an hour for Francis & Mailman attorneys); *Bonett*, 2003 WL 21658267, at *8 (approving $225.00 an hour for Francis & Mailman).

Associates John Soumilas and Michael Szymborski worked 58.6 hours and 3.7 hours, respectively, and both request a billing rate of $225.00 an hour. (Francis Att'ys' Fees Decl. ¶ 6.) Additionally, the firm has provided records showing 45.7 hours of work done by paralegals billing at a rate of $95.00 an hour. (*Id.*)

■ The Court has carefully reviewed the detailed bills submitted on behalf of the attorneys and paralegals working at Francis & Mailman, P.C. and finds that the hourly rates sought and time expended are fair and reasonable. The attorneys and staff of Francis & Mailman have been deeply involved in this litigation as far back as the investigatory phase, even before the filing of the Complaint. Counsel have drafted motions and settlement papers, conducted research, presented oral argument, and taken on the added responsibility of acting as liaison counsel and primary contact for the class. (Francis Att'ys' Fees Decl. ¶ 2 & Mot. for Att'ys' Fees App. 1 Ex. A.) Accordingly, the attorneys of

Francis & Mailman have met their burden of establishing the reasonableness of their fees, and the Court calculates their lodestar at $67,388.00.[6]

### 2. Calculating the Lodestar for Donovan Searles, LLC Attorneys & Staff

David Searles seeks $54,448.00 based on 131.2 hours worked at a rate of $415.00 an hour; Michael Donovan seeks $7,700.00 based on 17.5 hours worked at a rate of $440.00 an hour; and Christian Koerner seeks $405.00 based on 3.0 hours worked at a rate of $135.00 an hour. (Searles Decl. ¶ 5, attached as App. 2 to Mot. for Att'ys' Fees.)

Searles, who did the vast majority of the work on behalf of his firm, was admitted to the practice of law in 1975 and is an able, experienced, and reputable class action litigator. *See Saunders*, 2002 WL 1497374, at *15. Donovan is also an experienced class action litigator who has been certified as class counsel in a number of cases in this district. (Searles Decl. Ex. C (attorney biographies and qualifications).) Furthermore, hourly rates similar to those sought in this case have been awarded by courts in this district. *See, e.g, Orloff*, 2004 WL 870691, at *7 (approving $390.00 an hour for Donovan Searles lawyers); *Bonett*, 2003 WL 21658267, at *8 (approving $390.00 an hour for Searles and $125.00 an hour for Koerner); *Saunders*, 2002 WL 1497374, at *15 (finding $350.00 an hour for Searles; $390.00 an hour for Donovan; and $105.00 an hour for Koerner fair and reasonable); *see also* Searles Decl. ¶ 4 (collecting cases).

■ The attorneys and staff at Donovan Searles, particularly Searles, have been intimately involved in all aspects of this case, including investigating the factual background of the case, researching numerous legal issues, drafting motions, and participating in the appeal that Fleet took from this Court's ruling denying Fleet's motion to compel arbitration. (Searles Aff. ¶ 2 & Ex. A (billing records for Donovan Searles).) With the exception of four entries found on Donovan's timesheets, the Court finds that the

---

**6.** Included with their submission is twelve hours of anticipated time related to the preparation and attendance at the fairness hearing, securing the expert witness affidavit, and consulting with the expert witness. The Court finds that these items are also reasonable.

hourly rates and time expended are fair and reasonable.[7] However, the Court must exclude the following entries:

| Date | Hours | Rate | Value | Description |
| --- | --- | --- | --- | --- |
| March 8, 2004 | 1 | $440.00 | $ 440.00 | Calls with Fleet/Columbia client re: potential case |
| March 10, 2004 | 1 | $440.00 | $ 440.00 | More research/analysis on potential case |
| April 21, 2004 | 5 | $440.00 | $2220.00 | Work on new case/investigate facts, etc. |
| June 10, 2004 | 1 | $440.00 | $ 440.00 | Email re: complaint, etc. |

(Searles Decl. Ex. A.) There is insufficient information in these entries for this Court to determine if the hours claimed are unreasonable for the work performed or if the work was even necessary. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1190 (3d Cir.1990). The two March entries regarding a *potential* case occurred over a month after this case was filed and the June entry regarding an e-mail about the Complaint occurred more than four months after the filing. Without additional information, the Court is left to speculate on how these hours were spent. The April 21, 2004 entry, "work on new case/investigate facts, etc.," also lacks substance and cannot serve as the basis for fees. Accordingly, these eight hours, totaling $3,520.00, will be subtracted from the Court's award. The adjusted lodestar for the attorneys and staff at Donovan and Searles is $59,033.00.

### 3. Calculating the Lodestar for Thomas J. Lyons and the Consumer Justice Center

Thomas J. Lyons seeks $39,515.00, based on 112.9 hours worked at an hourly rate of $350.00. (Thomas J. Lyons Aff. ¶ 4, attached as App. 3 to Mot. for Att'ys' Fees.) Thomas J. Lyons has been practicing law for forty years and has been involved in over 250 consumer cases. (*Id.* ¶¶ 10–11 & Ex. 1) Thomas J. Lyons, Jr. and Andrea Weber, both of the Consumer Justice Center, seek $35,013.00, based on 135.46 hours worked at an hourly rate of $300.00 for Lyons, Jr. and $75.00 for Weber. (Thomas J. Lyons, Jr.

Decl. ¶ 6 & Ex. 2 (Consumer Justice Center billing records), attached as App. 4 to Mot. for Att'ys' Fees.) Lyons, Jr. has over ten years of experience with a special expertise in FCRA law. (Mot. for Att'ys' Fees App. 4 Ex. 1 (Curriculum Vitae of Thomas J. Lyons, Jr.).) He has been certified as class counsel in numerous cases and has filed over 300 cases against consumer reporting agencies and creditors. (*Id.*) In light of the evidence presented, the Court concludes that the fee applications of Thomas J. Lyons, Thomas J. Lyons, Jr. and Andrea Weber are reasonable. Their lodestar is thus $74,528.00.

In sum, disregarding the eight insufficiently substantive hours logged by Donovan, class counsel has documented 666.26 hours devoted to this case. Based on the hours submitted and the reasonable hourly rates offered by the attorneys, the total lodestar is $200,949.00.

### D. Lodestar Multiplier

 The lodestar multiplier aims to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work. *Rite Aid Sec. Litig.*, 396 F.3d at 305–06. Courts apply a multiplier to the lodestar calculation for any number of reasons, e.g., to reflect the risk of nonrecovery; to act as an incentive for the bringing of socially beneficial litigation; or to reward counsel for an exceptional result. *Prudential*, 148 F.3d at 340.

 The Supreme Court has held that a contingency multiplier based on risk is impermissible in statutory fee-shifting cases. *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Nonetheless, the Third Circuit has explicitly recognized that multipliers ranging from one to four are frequently awarded in common fund cases employing the lodestar method. *Prudential*, 148 F.3d at 341; *see also Stop & Shop*, 2005 WL 1213926, at *16. This case fails to fall neatly within the statutory fee-shifting realm that would make application of *Dague* straightforward and bar a risk-based

---

**7.** Included with their submission is ten hours of anticipated time for Searles related to carrying out the terms of the settlement, including con- tacts with class members. The Court finds that these items are also reasonable.

contingency multiplier. Yet this settlement also evades clear characterization as a common fund case: instead, this is a hybrid settlement that defies clear labels and requires the exercise of the Court's discretion. "The use of multipliers may still be allowed in common fund cases when cross-checking against a lodestar, or in a hybrid case...." *Ciccarone,* 2004 WL 2966932, at *5; *see also Brytus,* 203 F.3d at 243–44 (3d Cir.2000) (refusing to decide whether *Dague* bars contingency-risk multipliers in common fund or hybrid cases). Accordingly, the Court finds that a 1.5 multiplier is warranted in this case. The type of litigation undertaken by class counsel here, which addresses important consumer concerns that would likely be ignored without such class action lawsuits, must be encouraged. Applying the lodestar multiplier to the lodestar of $200,949.00, the Court arrives at a total of $301,423.50. That shall be this Court's award of attorneys' fees.[8]

## E. Percentage of Recovery Cross–Check

"Regardless of the method chosen, [the Third Circuit has] suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *Rite Aid Sec. Litig.,* 396 F.3d at 294. The Court will therefore conduct the percentage-of-recovery analysis as a cross-check, mindful that this method will be far from perfect given the circumstances of this case.

As previously noted, district courts in this circuit have been directed to employ seven factors in determining the reasonableness of a fee petition when calculating the percentage-of-recovery method. Those factors are: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Nichols v. SmithKline Beecham Corp.,* Civ. A. No. 00–6222, 2005 WL 950616, at *20 (E.D.Pa. Apr.22, 2005) (*citing Gunter,* 223 F.3d at 195 n. 1).

### 1. The Size of the Fund Created, the Number of Persons Benefitted, and Awards in Similar Cases

The most straightforward calculation of the size of the fund is to multiply the market value of the credit reports and credit scores to which the class members will be entitled by the number of individuals in the class. To keep the calculations on the conservative side, the Court will discount the value of one credit report because all Americans will soon be entitled to receive one free credit report. Accordingly, the value of two free credit scores and one free credit report for all class members is $1,937,427.60. If the $15,000.00 in incentive awards and $65,000.00 in administration fees paid by Fleet are added to that total, the value of the settlement is $2,017,427.60.[9] Using this figure, an award of $301,423.50 in counsel fees amounts to 14.94 % of the "fund" created by the settlement.

"One court has noted that the fee awards have ranged from nineteen percent to forty-five percent of the settlement fund." *General Motors,* 55 F.3d at 822 (citations omitted). In addition, class counsel has cited sixteen cases in which courts have awarded attorneys' fees between 14.5% and 40% of the settlement fund. (Mot. for Att'ys' Fees at 12.) Here, awarding 14.9% of the "fund" recovered is certainly in line with the awards made in other cases in this district.

### 2. Objections to the Settlement Terms and/or the Fees Requested by Counsel

"The absence of large numbers of objections mitigates against reducing fee awards."

---

8. Although the fees that class counsel will receive maybe significantly higher than the award given to the class, no per se rule forbids such an outcome. *See Oslan,* 232 F.Supp.2d at 444 ("Although the award of attorneys' fees exceeds the award to the class, there is no rule of strict proportionality that counsels the court to decrease attorneys' fees in order to match successful judgments or settlement awards."); *see also Bonett,* 2003 WL 21658267, at *8.

9. To remain on the conservative side, the Court will not consider the $50,000.00 *cy pres* donation or the noneconomic benefits obtained for the class in valuing the settlement "fund."

*In re Cendant,* 232 F.Supp.2d 327, 337 (3d Cir.2002) (citations omitted). There have been no objections to either the settlement agreement or the fees requested by counsel, and only seventy class members have exercised their opt-out rights. This factor therefore weighs in favor of approving fees in the amount of $301,423.50.

3. *The Skill and Efficiency of the Attorneys Involved, the Complexity and Duration of the Litigation, and the Amount of Time Devoted to the Case by Plaintiffs' Counsel*

As noted during the Court's discussion of the lodestar calculation, class counsel are experienced and skilled attorneys well-versed in the legal issues before this Court. Furthermore, settlement was reached at a stage early enough in the proceedings that significant legal expenses were avoided. Finally, even subtracting the hours for which insufficient support exists upon which to award attorneys' fees, class counsel has devoted a total of 666.26 hours to this litigation. The Court is aware of the contradiction found in rewarding class counsel for the efficient use of time while also rewarding class counsel for the large number of hours worked. The Court, however, finds that the number of hours devoted to the case in its early stages saved a much larger number of hours that certainly would have resulted had the parties not settled their differences. Therefore, this factor also weighs in favor of approving the application for attorneys' fees.

4. *The Risk of Nonpayment*

When a defendant is on the verge of insolvency or lacks unencumbered assets, this factor weighs in favor of the fee application. *Oh,* 225 F.R.D. at 152. There is nothing in the record that indicates Fleet is in poor financial condition. Therefore, there is no risk of nonpayment, and this factor weighs against approving the fee application.

5. *Conclusion*

Weighed together, these factors support awarding class counsel the bulk of their requested fees under the percentage-of-recovery method. Accordingly, the Court finds that the percentage-of-recovery cross-check supports the number reached applying the lodestar method, which is only slightly lower than the number class counsel sought.

**F. Costs**

██ Finally, class counsel seek $4,377.02 in costs as reimbursement for out-of-pocket costs reasonably incurred in conducting this litigation. This request for costs includes: 1) filing fees; 2) expert consulting; 3) telephone and fax charges; 4) copying charges; 5) computer assisted research; 6) travel, lodging and food; and 7) mailing charges. (Francis Att'ys' Fees Decl. Ex. C (seeking $2,480.20 in costs); Searles Decl. Ex. B (seeking $758.28 in costs); Thomas J. Lyons Aff. Ex. A (seeking $1,099.02 in expenses); Thomas J. Lyons, Jr. Decl. (seeking $39.52 in costs).)

The settlement agreement provides that Plaintiffs may apply for an award of attorneys' fees and reimbursement of out-of-pocket expenses not in excess of $320,000.00 and that Fleet will not object to such request. Furthermore, class counsel have submitted affidavits and detailed billing records that demonstrate the reasonableness of the costs requested. Items such as photocopying, telephone and fax charges, express mail charges, expert witness fees, and computer-assisted research are necessary for the prosecution of a large class action lawsuit. Accordingly class counsel are entitled to be reimbursed for those costs. *Oh,* 225 F.R.D. at 154 (citations omitted).

**VIII. CONCLUSION**

For the reasons stated above, the Court grants final certification of the class in accordance with Rule 23, holds that the settlement is fair, adequate and reasonable, and awards class counsel $301,423.50 in attorneys' fees and awards $4,377.02 in costs. An appropriate Order follows.

*ORDER*

AND NOW, this 28th of June, 2005, upon consideration of Plaintiffs' Motion for Final Approval of Class Action Settlement and Award to Representative Plaintiffs (Document No. 32), Plaintiff's Motion for Award of Attorneys' Fees and Reimbursement of Ex-

penses (Document No. 33), following a fairness hearing on May 31, 2005, and for the stated above reasons, it is hereby ORDERED that:

1. This action satisfies the applicable prerequisites for class action treatment under Fed.R.Civ.P. 23(a) and (b). The class as defined in the Settlement Agreement (the "Class") is so numerous that joinder of all members is not practicable, there are questions of law and fact common to the Class, the claims of the Class Representatives are typical of the claims of the Class, and the Class Representatives will fairly and adequately protect the interests of the Class. Questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

2. Notice to the Class required by Rule 23(e) of the Federal Rules of Civil Procedure has been provided in accordance with the Court's Preliminary Approval Order dated February 22, 2005, and such Notice by mail and publication has been given in an adequate and sufficient manner; constitutes the best notice practicable under the circumstances; and satisfies Rule 23(e) and due process.

3. The Settlement Agreement was arrived at as a result of arm's-length negotiations conducted in good faith by counsel for the parties, and is supported by the class representatives.

4. The settlement as set forth in the Settlement Agreement is fair, reasonable and adequate to the members of the Class in light of the complexity, expense and duration of litigation and the risks involved in establishing liability, damages and in maintaining the class action through trial and appeal.

5. The relief provided under the Settlement Agreement constitutes fair value given in exchange for the releases of the Settled Claims against the Released Parties, as those terms are defined below.

6. The persons listed on Exhibit A to Plaintiffs' Motion for Final Class Settlement have validly excluded themselves from the Class in accordance with the provisions of the Preliminary Approval Order.

7. The parties and each Class member have irrevocably submitted to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of the Settlement Agreement.

8. It is in the best interests of the parties and the Class members and consistent with principles of judicial economy that any dispute between any Class member (including any dispute as to whether any person is a Class member) and any Released Party which in any way relates to the applicability of the Settlement Agreement or this Final Judgment and Order of Dismissal should be presented exclusively to this Court for resolution by this Court.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

A. This action is finally certified as a class action against Fleet on behalf of a Settlement Class defined as follows:

All persons who had a Fleet credit card account between February 4, 2002 and February 11, 2005 whose credit reports were accessed or reviewed by Fleet after the account was closed or cancelled and after the indebtedness was discharged in bankruptcy.

B. The Settlement Agreement is finally approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure as fair, reasonable and adequate and in the best interests of the Class and the parties are directed to consummate the Settlement Agreement in accordance with its terms, as modified by this Court.

C. Fleet shall make a $50,000.00 *cy pres* donation to the Consumer Bankruptcy Assistance Project and the Consumer Credit Counseling Service of Delaware Valley as soon as practicable after the Effective Date of the settlement. Each entity shall receive $25,000.00. Copies of the transmittal letters shall be provided to the Court no later than five days after the donations are made.

D. This action is hereby dismissed on the merits, with prejudice and without costs.

E. For purposes of this Final Judgment and Order of Dismissal:

(i) "Settled Claims" means any and all claims that were asserted or that could have been asserted in the action arising

from Fleet's alleged improper or impermissible access of credit reports.

(ii) "Released Parties" means FleetBoston Financial Corp., Fleet Credit Card Services, L.P., and their respective parents, affiliates, subsidiaries, divisions, predecessors, successors, representatives, assignees, present and former officers, directors, employees, shareholders, insurers, attorneys and agents.

F. The Settled Claims are hereby compromised, settled, released, discharged and dismissed on the merits and with prejudice by virtue of the proceedings herein and this Final Judgment and Order of Dismissal.

G. Class members and their heirs, executors, administrators, successors and assigns are hereby permanently barred and enjoined from instituting, commencing, prosecuting or continuing to prosecute, either directly or indirectly, any Settled Claim against any of the Released Parties in any forum.

H. Without affecting the finality of this judgment, the Court hereby reserves and retains jurisdiction over this settlement, including the administration and consummation of the settlement. In addition, without affecting the finality of this judgment, the Court retains exclusive jurisdiction of, and Fleet and each member of the Class are hereby deemed to have submitted irrevocably to the exclusive jurisdiction for, any suit, action, proceeding or dispute arising out of or relating to this Order, the Settlement Agreement or the applicability of the Settlement Agreement. Without limiting the generality of the foregoing, any dispute concerning the Settlement Agreement, including, but not limited to any suit, action, arbitration or other proceeding by a Class member in which the provisions of the Settlement Agreement are asserted as a defense in whole or in part to any claim or cause of action or otherwise raised as an objection, shall constitute a suit, action or proceeding arising out of or relating to this Order. Solely for purposes of such suit, action or proceeding, to the fullest extent possible under applicable law, the parties hereto and all Class members are hereby deemed to have irrevocably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or inconvenient forum.

I. Upon consideration of the application for incentive awards to the named Plaintiffs, each named Plaintiff is awarded the sum of $5,000.00 in recognition of the valuable service they performed for and on behalf of the Class.

J. Plaintiff's counsel is awarded fees and reimbursement of expenses in the total amount of $305,800.52 as set forth in the Court's Memorandum and Order, which shall be submitted to Liaison Counsel James A. Francis of the firm Francis and Mailman, P.C.

K. Liaison Counsel shall be authorized and directed to allocate and distribute the fees and expenses among Class Counsel in accordance with the Court's Memorandum and Order.

L. All Class Counsel shall be subject to the continuing jurisdiction of the Court in connection with this award of attorneys' fees and reimbursement of expenses.

